**Joseph LERRO and John Duty, Plaintiffs–Appellants,**

v.

**The QUAKER OATS COMPANY, Snapple Beverage Corporation, and Thomas H. Lee, Defendants–Appellees.**

Nos. 95–3495, 95–3496.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1996.

Decided May 17, 1996.

Mark C. Gardy, Arthur N. Abbey (argued), Abbey & Ellis, New York City, Richard S.

Schiffrin, Michael D. Craig, Schiffrin & Craig, Buffalo Grove, IL, for John Duty, Joseph Lerro.

Jerold S. Solovy, Douglas A. Graham, Jenner & Block, Chicago, IL, Dennis J. Block (argued), Paul J. Collins, Weil, Gotshal & Manges, New York City, for Quaker Oats Co., Loop Acquisition Corp.

Before EASTERBROOK, ROVNER, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Quaker Oats Company acquired Snapple Beverage Corporation for $1.7 billion in 1994. A merger agreement was signed on November 1, 1994, and a tender offer was announced to the public on November 4. Quaker Oats offered $14 in cash for each share of Snapple stock; the merger agreement contemplated the same payment per share. Investors who thought $14 too low could refuse to tender, vote against the merger, and demand appraisal under § 262 of the Delaware Corporation Law. Nonetheless, the success of the transaction was assured by the support of Thomas H. Lee, who controlled at least 35 percent of Snapple's shares (this is plaintiffs' figure; the tender offer documents say that he controlled 47 percent). Lee not only promised to tender his shares but also gave Quaker Oats an option to purchase them even if the tender offer failed. When the offer closed, 96.5 percent of Snapple's stock had been tendered. Quaker Oats immediately effected a short-form merger under Delaware law between Snapple and LOOP Acquisition Corporation, which had been created for this purpose. Later LOOP changed its name to Snapple Beverage Corporation, which is today a wholly-owned subsidiary of Quaker Oats.

I

One part of the offering document intrigued investors Joseph Lerro and John Duty:

At the insistence of Parent [Quaker Oats] and to induce Parent to enter into the Merger Agreement, a number of agreements relating to employment, non-competition, consulting and other matters were entered into and are described in the Schedule 14D–9. Additionally, the Company [Snapple] and Stokley–Van Camp, Inc., a subsidiary of Parent entered into a new Distribution Agreement (the "Distributor Agreement") with Select Beverages, Inc. ("Select") for the distribution of their respective products. A majority of the common stock of Select is held by affiliates of THL [Thomas H. Lee Company] and 20 percent of such common stock is held by the Company. The Distributor Agreement grants to Select the exclusive right to distribute in certain areas of Indiana, Illinois (including Chicago) and Wisconsin, certain sizes of Snapple and Gatorade in certain channels. The Agreement commences upon consummation of the Offer and is perpetual, and is subject to termination if Select fails to satisfy certain tests for increasing distribution penetration and available visicoolers. The effect of the Distribution Agreement will be to cause Select to lose some Snapple sales and to gain some Gatorade sales.

Lerro and Duty filed separate actions under § 14(d) of the Securities Exchange Act of 1934, as added by the Williams Act of 1968, 15 U.S.C. § 78n(d), contending that the Distributor Agreement provided Lee with extra compensation for his shares, in violation of § 14(d)(7) and the SEC's Rule 14d–10(a)(2), 17 C.F.R. § 240.14d–10(a)(2). Section 14(d)(7) provides that when a bidder "varies the terms of a tender offer ... before the expiration thereof by increasing the consideration offered to holders of such securities," it must apply the increase to all shares acquired under the offer. The Distributor Agreement, which was in place from the start, is hard to characterize as an "increase" in compensation. Rule 14d–10(a)(2), adopted in 1986, is broader. It forbids any tender offer that does not satisfy this condition:

The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.

According to Lerro and Duty, profits anticipated under the Distributor Agreement are consideration Lee received in his role as a

security holder, which per Rule 14d–10(a)(2) must be paid to everyone else who tendered into the offer.

Quaker Oats believes that the Distributor Agreement is a substitute for Select's existing contractual rights (it had perpetual distribution rights for some Snapple products) rather than compensation for anyone's shares. Moreover, Quaker Oats submits, the valuation of such a contract as of November 1994 would be next to impossible, because Select's profits depended on how fast it could increase beverage sales—indeed, on whether it could avoid termination under the "tests for increasing distribution penetration and available visicoolers". Lee was not required by the Internal Revenue Code to treat the present value of the flow of future profits as a capital gain realized in November 1994 from the sale of stock, and one may doubt whether it would be sound to try to capitalize those profits for other purposes. There is also some question whether Rule 14d–10(a)(2) creates a private right of action for damages. Compare *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), with *Epstein v. MCA, Inc.*, 50 F.3d 644, 649–52 (9th Cir.1995), reversed on other grounds under the name *Matsushita Electric Industrial Co. v. Epstein*, — U.S. —, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

Instead of deciding the case on any of these grounds-some of which might have required factual development-the district judge assumed that the Distributor Agreement compensated Lee for his shares in Snapple but dismissed the suit anyway under Fed. R.Civ.P. 12(b)(6). Plaintiffs could not state a claim, the judge concluded, because the Distributor Agreement had been signed before the tender offer began and therefore fell outside Rule 14d–10(a)(2), which requires only that the bidder pay every tendering investor the "highest consideration paid to any other security holder *during* such tender offer" (emphasis added). If Quaker Oats had purchased all of Lee's shares for $20 apiece on November 1, the district judge believed, it still could have offered $14 to the remaining investors. Treating the Distributor Agreement as a premium for each of Lee's shares is the same as a higher cash price in advance,

the court thought. A holding that the offer did not "commence" until after November 1 polished off the case. (Delaware law permits unequal division of the gains from transactions in corporate control, and plaintiffs therefore did not present any state-law ground for laying claim to a portion of the value of the Distributor Agreement. See *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Fins v. Pearlman*, 424 A.2d 305 (Del. 1980).)

## II

Before we tackle the securities-law issues, we address the district court's alternative ground of decision: that plaintiffs forfeited all of their arguments by failing to object within 10 days after a magistrate judge recommended dismissal of the complaint. See *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538 (7th Cir.1986). The magistrate judge filed his report and recommendation on August 2, 1995, and served it on the parties the same day. Plaintiffs filed their objections on August 18. The district judge held that plaintiffs had only until August 15. The dispositive question is whether the additional time when service is by mail (as the magistrate judge's report was served), see Fed.R.Civ.P. 6(d), is added before or after the application of Fed.R.Civ.P. 6(a). Perhaps we could duck this question, because, in addition to finding the plaintiffs' objections untimely, the district judge decided the case on the merits—as he had every right to do, for this time limit is not jurisdictional. *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir.1994). But because the question has divided the judges of the district court and has a potential to trip up lawyers in other cases—where district judges may not be so forgiving—we think it prudent to address the question now.

"Within 10 days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b). Because Rule 72(b) requires the magistrate judge to "serve," rather than just to "file," the recom-

mendation, Fed.R.Civ.P. 6(e) comes into play: "Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period." Contrast *Lorenz v. Valley Forge Insurance Co.*, 23 F.3d 1259 (7th Cir.1994) (when judicial action is complete on filing, Rule 6(e) does not apply). The magistrate judge's report was served by mail. Then there is Fed.R.Civ.P. 6(a), part of which says: "When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." How do these three rules fit together?

The district judge began with the 10 days provided by Rule 72(b) and added 3 days under Rule 6(e). Because the total is 13, the judge concluded that Rule 6(a) does not apply. A competing way to count applies Rule 6(a) before Rule 6(e). The 10 days provided by Rule 72(b) are fewer than 11, so Rule 6(a) excludes weekends and holidays. That turns 10 days into 14 (two weekends and no holidays during the period in question), plus 3 for service by mail, for a total of 17 calendar days. Service occurred on August 2, 1995, making the objections due on August 19, a Saturday. Another part of Rule 6(a) allows parties to file the next day the court is open—here, on Monday, August 21. Plaintiffs filed on Friday, August 18, timely if this method of counting is right.

Neither Rule 6 nor the committee note explaining its rationale discusses whether to apply Rule 6(a) before or after Rule 6(e). The text could support either approach. Weekends are excluded, under Rule 6(a), "[w]hen the period of time prescribed or allowed is less than 11 days". But what is "the period of time"? The district judge thought that "the period of time" is the sum of all allowable periods; but one could as easily say that *the* period of time is the one that would govern in the absence of Rule 6 (here, 10 days under Rule 72(b) to file objections) rather than the total time allowed by the interplay of rules. Referring to the specific rule rather than to the rule plus exten-

sions is simpler; it is also more sensible. See Charles Alan Wright & Arthur R. Miller, 4A *Federal Practice and Procedure* § 1171 at 516–21 (1987).

Rule 6(e) is designed to give a litigant approximately the same *effective* time to respond whether papers are served by hand or by mail. If service is by hand, then the time to respond starts immediately; if service is by mail, the party receives three extra days as an approximation of the time required for mail delivery, and on average should have the same number of days to act as he would have had following service in hand. We know from Rules 72(b) and 6(a) that, if the magistrate judge had passed his decision over the bench to counsel, plaintiffs would have had 14 calendar days to file objections. It would be queer if service by mail, which delays actual knowledge of the decision, would reduce the time to object. Yet that is the effect of adding time under Rule 6(e) first; the time would fall from 14 calendar days for personal service to 13 calendar days for service by mail. And because mail delivery takes time (plaintiffs say that it took five days), the time available to act can be curtailed substantially—here, to eight calendar days. Interactions within a complex set of rules sometimes can have unexpected and unwelcome effects, but we should not create them when the text readily can bear another meaning. The only way to carry out Rule 6(e)'s function of adding time to compensate for delays in mail delivery is to employ Rule 6(a) first. The objection to the magistrate judge's report therefore is timely.

### III

■ The district court's analysis of the merits depends on its conclusion that, so far as the Williams Act and Rule 14d–10(a)(2) are concerned, Quaker Oats could have bought Lee's shares at $20 (or $50) apiece the day before commencing the tender offer, without objection from other investors. Is that true? Certainly it is consistent with the language of the rule, which gives every investor whose shares are acquired as part of the offer "the highest consideration paid to any other security holder *during* such tender offer" (emphasis added). Everyone who ten-

ders receives the highest price paid "during the tender offer"—not, as plaintiffs would have it, that the minimum price "during the tender offer" is set by a price paid at some other time. Before the offer is not "during" the offer. Many cases, such as *Gustafson v. Alloyd Co.*, —— U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), tell us to respect the language of the securities statutes and regulations. The difference between "during" and "before" (or "after") is not just linguistic. It is essential to permit everyone to participate in the markets near the time of a tender offer. Bidders are forbidden to buy or sell on the open market or via negotiated transactions during an offer, see Rule 10b–13(a), but they are free to transact until an offer begins, or immediately after it ends. Several courts accordingly have held that these transactions do not establish a floor under the price to be paid for shares tendered into the offer. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 778–79 (2d Cir.1991); *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir.1985); *Kahn v. Virginia Retirement System*, 783 F.Supp. 266, 269–70 (E.D.Va.1992), affirmed on other grounds, 13 F.3d 110 (4th Cir.1993); *Priddy v. Edelman*, 679 F.Supp. 1425, 1431–32 (E.D.Mich.1988), affirmed on other grounds, 883 F.2d 438, 446 (6th Cir. 1989).

Purchases near in time to a tender offer, but outside it, may be essential to transactions that all investors find beneficial. Controlling shareholders often receive indirect or non-monetary benefits and are unwilling to part with their stock (and hence with control) for a price that outside investors find attractive. At the same time, potential bidders may be unable to profit by paying everyone the price essential to separate the insiders from their shares. Suppose a firm's stock is trading for $20, insiders who hold 30 percent of the firm would not sell for less than $30, and a potential bidder values the entire firm at $25 per share. An offer of $25 for all stock would not attract the insiders' shares; and as a practical matter (if not a legal matter under some states' laws), failure to attract the control bloc would doom the offer.

The transaction would be feasible, however, if the acquiror could pay $30 to the control group before the bid commences and acquire the rest of the stock at $22 per share, for an average price of $24.40. Everyone is better off: the public investors prefer $22 to $20; the control group is happy; the bidder anticipates a profit of 60¢ per share. Treating the Williams Act as a mandate for an identical price across the board—as opposed to an identical price for all shares acquired in the offer—would make all investors worse off.

Just as those who sell for $15 today cannot complain if their trading partner pays $20 to someone else tomorrow, those who sell in the market a day before the offer starts are not entitled to the higher price paid to those who wait (nor are those who sell in the offer entitled to a higher price paid before or after its duration); the point of Rules 10b–13, 14d–10, and their cousins is to demark clearly the periods during which the special Williams Act rules apply. Once the offer begins, professional investors and amateurs receive the same price. That is the objective of § 14(d)(7) and Rule 14d–10. Persons who make tender offers do not lose their ability to participate as investors for undefined periods "near" the time of the offer. With millions or even billions of dollars at stake, precise definition of the blackout period is essential, and the SEC has accordingly consistently differentiated actions "during" an offer from those close to the offer's beginning or end. The line is arbitrary, to be sure; it invites transactions that use the rules for personal advantage ("tax planning" is a respected specialty of the bar, while "tax evasion" is a felony); but some line is essential, and it had best be a bright one.

Against this conclusion, which rests on both the language and the function of the rules, plaintiffs set *Field v. Trump*, 850 F.2d 938 (2d Cir.1988), and *Epstein v. MCA, supra*. *Field* applies a step-transaction approach to include within a tender offer a transaction that occurred between two offers. The bidder commenced an offer, dropped it for a day, and then made a second offer. During the single day in which no offer was formally outstanding, the bidder acquired one family's stock at a price exceeding that

paid to other investors in the second, completed tender offer. The second circuit held that the first and second offers should be integrated with the intervening day's purchases to form a single transaction; understood in this way, the purchase in the middle was an increase in compensation covered by § 14(d)(7). "Integration" of purchases or sales in this fashion is standard fare under the securities laws, which apply to whole "offers" or "offerings" and therefore require courts to establish whether a particular course of conduct is an "offering." *Trump* did not suggest that its conclusion—that purchases between two offers were during a single integrated offer—required a modification of *Hanson Trust*, which concluded that "street sweep" purchases within hours after the end of a tender offer are not subject to the Williams Act rules. *Kramer*, which the second circuit decided after *Field*, holds that a transaction similar to the one between Lee and Quaker Oats does not offend Rule 14d–10.

*Epstein* does not present an integration or step-transaction problem. Matsushita wanted to acquire MCA and was willing to pay $71 per share. Two of MCA's largest investors had substantial blocks of stock with a basis of 3? per share. Taxes on the recognition of $70.97 per share made the offer unattractive to them. Matsushita offered these two investors a special deal, under which shares would be exchanged (without recognition of gain) rather than purchased. A subsidiary of Matsushita swapped its own preferred stock for the common stock of MCA. Problems under Rule 14d–10 arose because Matsushita funded the subsidiary at 106 percent of the price paid in the tender offer—and because the exchange did not occur until the tender offer had succeeded. Until then, both sides were free to back out. *Epstein* lacks precedential value; the Supreme Court vacated the judgment after concluding that the ninth circuit should not have reached the merits in light of a prior settlement of class litigation in Delaware. Whatever persuasive force the opinion retains does not assist our plaintiffs, because *Epstein* simply does not address the proper treatment of a transaction completed before a tender offer begins—except in dictum that favors Quaker Oats.

"If, in advance of the tender offer, [the investor] had become unconditionally obligated to exchange his MCA shares, the transaction would not have violated Rule 14d–10, even if Matsushita believed that acquiring [the] shares was a first step in acquiring MCA." 50 F.3d at 656–57. On this understanding, neither the second nor the ninth circuit would see a problem in the transaction by which Quaker Oats acquired Snapple.

Of course, all of this assumes that the transaction between Stokley–Van Camp and THL (and therefore between Quaker Oats and Lee) really did precede the commencement of the tender offer. Plaintiffs' complaint alleges, and we therefore assume, that the Distributor Agreement was integral to the transaction, in the sense that Quaker Oats would not have launched the bid unless it knew that Lee was satisfied with the terms. The Distributor Agreement was *signed* on November 1, but its effect depended on the merger and obviously was bound up with the tender offer too (Lee promised to tender his shares and gave Quaker Oats an option on them). Nonetheless, this does not establish that Quaker Oats paid Lee more than $14 per share "during" the tender offer. The agreements were signed before the offer began, and were effective with a merger that occurred later. *Kramer* rejects, rightly we think, any argument that a follow-up merger should be integrated with a tender offer. They are different transactions, under different bodies of law (federal law regulates the tender offer and state law the merger). Accepting plaintiffs' request to treat the tender offer and the merger as a single step would imperil countless ordinary transactions—from two-tier tender offer and merger sequences (with different prices, or different forms of securities, offered in the two tiers) to simple employment agreements under which the surviving entity promises to employ managers for stated terms or give severance pay. Suppose a firm's CEO, who is also a shareholder, negotiates a deal under which his contract will be extended for two years after an acquisition. Must a court attempt to determine how much in advance of two years the CEO would have been eased out, but for the agreement? On plaintiffs'

view the difference is a "premium" for the CEO's shares, payable to all other investors too. Yet none of the regulations implementing the Williams Act requires managerial salary, or Golden Parachute payments, to be imputed to stock and offered to non-managers as well.

Doubtless there are limits to the use of a follow-up merger as a means to deliver extra compensation. Suppose Quaker Oats had promised Lee $14 for each share he tendered during the offer, plus another $6 for each of these shares one month later. Just as tax law requires "boot" to be treated as a gain received from the sale of stock, securities law treats "boot" as a payment during the tender offer. But as we have already mentioned, the Internal Revenue Code does not require Lee to treat the present value of THL's profits as part of the price realized on the exchange of Lee's shares in Snapple, and we see no reason to devise a broader attribution doctrine under the securities laws. Plaintiffs have not alleged that Lee and Quaker Oats devised a boot transaction, and we therefore need not decide how such deals should be treated under Rule 14d–10. Plaintiffs' own complaint alleges that Lee controlled enough shares to ensure the success of Quaker's bid, so the "success and merger" contingency in the Distributor Agreement was theoretical only.

Because transactions before or after a tender offer are outside the scope of Rule 14d–10, we must decide whether the transactions at issue preceded the tender offer. Rule 14d–2(a) addresses this directly:

A tender offer shall commence for the purposes of section 14(d) of the Act and the rules promulgated thereunder at 12:01 A.M. on the date when the first of the following events occurs:

(1) The long form publication of the tender offer is first published by the bidder pursuant to Rule 14d–4 (a)(1);

(2) The summary advertisement of the tender offer is first published by the bidder pursuant to Rule 14d–4 (a)(2);

(3) The summary advertisement or the long form publication of the tender offer is first published by the bidder pursuant to Rule 14d–4(a)(3);

(4) Definitive copies of a tender offer, in which the consideration offered by the bidder consists of securities registered pursuant to the Securities Act of 1933, are first published or sent or given by the bidder to security holders; or

(5) The tender offer is first published or sent or given to security holders by the bidder by any means not otherwise referred to in paragraphs (a)(1) through (4) of this rule.

The Merger Agreement and Distributor Agreement were signed on November 1, 1994. News of an impending bid first reached the public, via the *Dow Jones News Wire*, on November 2, and the tender offer was formally announced on November 4, commencing it on that date.

Not so, plaintiffs insist. They believe that the offer commenced even before November 1 under Rule 14d–2(a)(5), because it was "given" to Lee and other Snapple insiders before then. How could they negotiate the agreements and promise to tender their shares, plaintiffs ask, if an offer had not been extended? Plaintiffs read "security holders" in Rule 14d–2(a)(5) to mean *any* security holder, rather than investors in general; on plaintiffs' understanding, a tender offer "commences" as soon as a potential bidder opens negotiation with a potential target's management. Yet no case or administrative interpretation supports that understanding. Rule 14d–2 contemplates general publication or notice, as the SEC's explanation confirms. 44 Fed.Reg. 70340 (Dec. 6, 1979). Under the rule, "the tender offer" means the definitive announcement, not negotiations looking toward an offer. No one supposes that a public offer of securities begins, for purposes of § 5 of the 1933 Act, when a firm and its investment bank open private conversations; why should a tender offer be treated differently? The language "first published or sent or given to security holders" comes from § 14(d)(1) of the Act, and Rule 14d–4(a) elaborates by defining this event as the transmission of the forms required by statute and regulation; that step necessarily follows rather than precedes negotiations.

Treating private negotiations as the "commencement" of a tender offer would have effects far beyond requiring Quaker Oats to pay a little more than $14 per share to Snapple's public investors. For starters, it would forbid outright the kind of bargain that Quaker and Snapple's managers reached. Under Rule 10b–13(a), once a tender offer begins, the bidder cannot acquire shares (or options) in negotiated transactions. Inability to reach a modus vivendi would make bids less attractive, reduce the prices bidders are willing to pay, or both—to the detriment of the investors Congress set out to protect. If the offer commences when negotiations open, then potential bidders must get out of the public markets too. And that is not all. The Williams Act and the accompanying regulations are crammed with timetables measured from the commencement of the bid. As soon as an offer commences, the bidder must file and transmit to investors several complex forms and schedules. See Rules 14d–3, 14d–6. This can hardly be done at the outset of negotiations, yet on plaintiffs' view the entire offer was unlawful because it was commenced long before the required forms were disseminated. Under Rule 14e–1(a), a tender offer must be held open for 20 days from the time it is "first published or sent or given to security holders". This period is designed to afford even amateur investors time to read the documents, decide what to do, and tender their shares. But if plaintiffs are right, and the offer is "first published or sent or given to security holders" when private negotiations begin, then the 20 days may be up before the public announcement, and the "Saturday night special" offer—open only to the cognoscenti—would again be lawful. Similarly, the times for withdrawal, proration rights, and so on, run from commencement of the offer and would be disrupted if not nullified by a conclusion that a private negotiation marks the commencement. It would defeat the purposes of the Williams Act and the SEC's regulations to close the proration pool before the public learns of the offer. It would wreak havoc to say that the operation of all of the clocks cannot be known until, years after the events, a judge declares when negotiations became sufficiently serious to mark the commencement of the offer. Everything depends on making the times start from a *public* announcement—and on making that time as clear as humanly possible. That is the function of Rule 14d–2.

Plaintiffs remind us that neither the Williams Act nor the SEC's regulations defines "tender offer." That term has been frustratingly difficult to encapsulate. Compare *Hanson Trust* with *SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945 (9th Cir. 1985). True enough, but our case is about "when" rather than "what." Quaker Oats made a traditional tender offer. The commencement date for such an offer is rigorously defined. This offer commenced at 12:01 A.M. on November 4, 1994. There are no facts to find or inferences to draw in the district court; plaintiffs concede that the public announcement by the bidder occurred on that date. From this conclusion everything else follows, and the judgment is

Affirmed.