EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

SWP, INC., Defendant.

No. 3:98–CV–562RM.

United States District Court,
N.D. Indiana,
South Bend Division.

July 2, 2001.

Michelle Eisele, JoAnn Farnsworth, Laurie A. Young, Jamie Darin Prenkert, Equal Employment Opportunity Commission, Michelle E. Smith, Reed & Smith, Indianapolis, IN, for Plaintiff.

Robert T. Sanders, III, David G. Thomas, Sanders Pianowski, LLP, Elkhart, IN, for Defendant.

### ORDER

MILLER, District Judge.

On June 8, 2001, Magistrate Judge Christopher A. Nuechterlein entered a report and recommendation on the EEOC's motion to join RBK as a defendant under Fed.R.Civ.P. 25(c) and RBK's motion to dismiss. Without objection from the parties, the court has reviewed the report and recommendation and found it to be both accurate and appropriate. For this reason

the court ADOPTS the report and recommendation of Magistrate Judge Nuechterlein, GRANTS the EEOC's motion to join RBK as a defendant under Fed.R.Civ.P. 25(c) [Docket No. 95] and DENIES AS MOOT RBK's motion to dismiss [Docket No. 103]

SO ORDERED.

## REPORT AND RECOMMENDATION

NUECHTERLEIN, United States Magistrate Judge.

On March 2, 2000, a jury rendered its verdict against defendant SWP, Inc. d/b/a Superior Wood Products ("SWP") on a claim of sexual harassment under Title VII and awarded the plaintiff, Equal Employment Opportunity Commission ("EEOC"), a $170,000 judgment. However, before the plaintiff could collect the judgment, the shareholders of SWP devised a plan to sell all of SWP's assets to RBK Development, Inc. ("RBK") through a friendly foreclosure proceeding with the bank. After the foreclosure, RBK, composed of former shareholders and officers of SWP, accepted responsibility for all of SWP's debts except one: the jury's sexual harassment judgment against SWP. Because SWP no longer had any assets and was judgment proof, the plaintiff was unable to collect its judgment. The plaintiff then filed a motion to join RBK as a defendant pursuant to Fed.R.Civ.P. 25(c).

On August 18, 2000, the Honorable Robert L. Miller, Jr. referred all post-judgment proceedings to the undersigned Magistrate Judge. The plaintiff's motion to join RBK as a successor defendant alleged that RBK was liable for the judgment because RBK knew about the judgment, SWP had no money to pay the judgment, and RBK continued SWP's business. The Court conducted an evidentiary hearing on January 5, 2001, and heard oral argument on the legal issues of this case (and additional evidence from RBK) on March 30, 2001. Because the undersigned has concluded that successor liability under Title VII applies to RBK, the Court **RECOMMENDS** that the EEOC's motion to join RBK as a defendant under Fed.R.Civ.P. 25(c) [Doc. No. 95] should be **GRANTED**.

## I. BACKGROUND FACTS

### A. The Jury Renders its Verdict

The EEOC filed this suit on November 2, 1998, on behalf of a class of former female employees of SWP. The complaint alleged that a male supervisor at SWP sexually harassed SWP's female employees because of their sex. The case proceeded to trial. Several SWP representatives testified at trial including Roger Korenstra, Bruce Korenstra, and Gale Schaffer. On March 2, 2000, the jury issued its verdict against SWP consisting of $75,000 in compensatory damages and $115,000 in punitive damages.

On the same day as the jury's verdict, the EEOC filed a motion for injunction seeking a court order prohibiting SWP from "shutting its doors" just to avoid paying the judgment. The district court denied the motion because SWP could legitimately end operations for financial reasons and because, at that time, the EEOC lacked evidence that SWP would shut its doors for the sole purpose of avoiding the judgment.

On March 17, 2000, the district court reduced the punitive damage award by $25,000 in conformity with the limitations found in 42 U.S.C. § 1981a(b)(3). The court then taxed costs against SWP in the amount of $4995.35. Accordingly, the judgment against SWP totals $169.995.35 plus post-judgment interest at the rate of 6.197%. SWP did not appeal the judgment.

### B. SWP Formulates a Plan to Avoid Paying the Judgment

▉▉▉ Post judgment discovery, including several depositions, and the two evi-

dentiary hearings, reveal that just one day after the jury's verdict, March 3, 2000. SWP representatives Bruce Korenstra and Andrew Swihart met with SWP's banker, David Bickel, a loan officer at the Lake City Bank. According to Bickel's notes of the meeting,[1] Korenstra was considering filing for bankruptcy to discharge the judgment, but he wanted to reaffirm all remaining debts. Korenstra and Swihart reported to Bickel that SWP had actually made $78,000 profit for fiscal year 1999, but through some "aggressive accounting and adjustments," the company reported a loss of $3000. According to Bickel's notes, Korenstra and Swihart projected profits for 2000 to be $330,000.

Bickel met again with Bruce Korenstra on March 15, 2000, and discussed the judgment. Bickel's notes report several excuses offered by Korenstra as to why the jury's verdict was unfair. Bickel's notes also reveal that Korenstra told Bickel that he could pay the judgment if he wanted from his personal assets or other business ventures, and that Korenstra had spoken with a bankruptcy attorney about filing for bankruptcy, discharging the judgment, but reaffirming all other debt. Korenstra told Bickel that the bankruptcy attorney had recommended not filing for bankruptcy, but instead, negotiating with the EEOC to reduce the amount of the judgment.

Bickel's Credit Memoranda of March 23, 2000, indicates that Bruce Korenstra met again with Bickel. Korenstra told Bickel that he did not want to pay the judgment because he did not feel it was "correct" or that SWP should have to pay it. Korenstra discussed a "plan" devised with another attorney to do a "friendly foreclosure."

According to the plan, the bank would foreclose on SWP; then SWP shareholders would "form a new corporation and buy the assets back." Bickel later testified at his deposition that the bank's senior management did not want to do a friendly foreclosure. However, Bickel commented that the bank might be willing to perform a "friendly foreclosure" "as long as we don't end up getting sued or drug into this in some way shape or form."

Bickel's memo of a April 17, 2000, telephone call indicates that Andrew Swihart called Bickel and reported that SWP's year-end financials for fiscal year 1999 showed a $170,000 loss, $165,000 of which was the court judgment. Swihart however projected a profit of $200,000 to $300,000 for the coming year. Swihart also told Bickel that the shareholders of SWP "plan[ned] to put the company in receivership and dissolve it with [the bank's] assistance and start up a new company to shed this liability."

### C. The Bank Forecloses

Lake City Bank initially refused to assist with the friendly foreclosure until forced to do so by SWP. Michael Armey, legal counsel for Lake City Bank, testified at his deposition that "based on discussions that I'd had with them [the bank], they didn't feel that they were at risk on the loans and that they didn't really want to get into this thing unless they were going to have to and there was no alternative short of taking their assets and selling them."

Bickel's May 4, 2000, Credit Memoranda discloses that Roger and Bruce Korenstra

---

1. The notes were created as part of a "Credit Memoranda." Such memoranda meet the requirements of Fed.R.Evid. 803(6) regarding business records that qualify as an exception to the rule against hearsay. *See* 11/16/00 Deposition of David Bickel at 25–26. The statements recorded in the memoranda and made by representatives of SWP or RBK are not hearsay because they qualify as admissions by a party-opponent under Fed.R.Evid. 801(d)(2).

met with him and several representatives of Lake City Bank. Bickel's notes state that:

The Korenstras informed us that due to a judgment entered against SWP, Inc. in favor of former employees of SWP, Inc. and the EEOC, they were no longer willing to continue and support financially the business operations of SWP, Inc. They further indicated that they were considering revoking their [personal] guarantees of the SWP, Inc. indebtedness owing to Lake City Bank. Such a revocation would not affect their responsibility for existing sums outstanding, but would revoke their guarantees for any additional sums advanced after the date of the revocation. Based on these statements, we do not believe that SWP, Inc. will be making any payments upon our indebtedness and that it is likely we will be forced to institute collection proceedings.

After meeting with Roger and Bruce Korenstra, the bank officials decided to hold off on foreclosure until the defaults forced the bank to make a decision on how to proceed. Bickel noted in his Credit Memoranda that "[a]t the present time, there are several existing technical defaults under the SWP, Inc. loan documents; however, no steps have been taken to call the loans."

Swihart testified at his deposition that Bruce Korenstra directed him to default on the loans with Lake City Bank. This forced the bank to take steps to protect its interests. On June 7, 2000, Armey sent a letter to SWP informing SWP that the loans were in default and that the unpaid balance was accelerated with a deadline for full payment of June 15, 2000. The letter then concluded as follows:

In prior discussions and correspondence, you have advised Lake City Bank that it is your intention to allow the liquidation of SWP, Inc. in order to avoid payment of a judgment entered against SWP, Inc. and in favor of former employees. If that continues to be your intention, then I suggest that you cooperate with Lake City Bank during the sale process so we can maximize the sale prices and limit the expenses.

6/7/00 Letter from Armey to SWP at 2.

On June 21, 2000, SWP entered into a foreclosure agreement with the bank. Under this agreement, SWP turned over ownership of its assets to the bank. The parties agreed to keep SWP operating under the bank's supervision, but with the continuing involvement of Bruce Korenstra, Roger Korenstra, and SWP's management, including Andrew Swihart and Gale Schaffer.

### D. RBK Prepares its Ownership

Bruce Korenstra testified at his deposition that he and Roger had previously incorporated RBK in June 1999, and were the sole shareholders, officers, and directors in RBK from its incorporation until June 2000. On June 26, 2000, eleven days before RBK bought SWP's assets, Bruce sold his fifty shares of RBK to his wife, Sandra (30 shares), and to Gale Schaffer (20 shares). Roger sold twenty of his fifty shares to Andrew Swihart.

### E. RBK Buys SWP's Assets

Bickel's Credit Memoranda of June 28, 2000 reveals that Bruce Korenstra and Swihart met with Bickel regarding the daily operations of SWP. At the close of that meeting, Korenstra (who had sold his interest in RBK to his wife and Shaffer two days earlier) offered to buy the assets of SWP from the bank for $650,000. Bickel testified that the bank took the matter under advisement, but ultimately rejected the offer.

Bickel's Memoranda reveals another meeting with the same parties on June 30,

2000, along with Bruce Korenstra's wife, Sandra, and another representative from the bank. Korenstra told Bickel that he and others would put together another offer for the purchase of SWP's assets. On July 7, 2000, Lake City Bank sold the assets of SWP to RBK for $701,000.

### F. RBK has Money to Pay Back the Bank, to Pay Back its Investors, and to Continue in Business as Superior Wood Products

The evidence is undisputed that Sandra Korenstra, Bruce's wife, and Roger Korenstra financed RBK. They each loaned RBK $350,000 to purchase the assets of SWP from the bank which at the same time paid off SWP's debts and obligations with the bank and others. Although RBK has no line of credit with any financial institution, on July 31, 2000, after being in business for a mere three weeks, RBK paid back $500,000 to Sandra and Roger Korenstra ($250,000 each). The money came from SWP's customers who paid RBK a deposit and for finished product.

RBK also admits that when RBK started its operations on July 10, 2000, it hired all of SWP's employees. It operates out of the same building as SWP. It uses the same method of production that SWP used, and continues to serve many of the same customers and to make many of the same products of SWP, all under the name of Superior Wood Products.

The EEOC and the individual former employees it represents have been unable to collect anything on the jury's verdict in their favor.

## II. THE STANDARD FOR SUCCESSOR LIABILITY FOR EMPLOYMENT DISCRIMINATION

### A. Successor Liability under the Common Law

■ Generally, a corporation that purchases the assets of another corporation does not assume the selling corporation's liabilities. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1325 (7th Cir.1990) (citing *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977)). Courts have recognized four exceptions to this general rule. The corporation buying the assets is liable as a · successor when (1) the purchaser expressly or impliedly agrees to assume the liabilities of the selling corporation; (2) the transaction is a *de facto* merger or consolidation; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is an effort to fraudulently escape liability. *Id.*

### B. "Liberalized" Successor Liability under Employment Statutes

■ Successor liability for employment discrimination judgments is broader than the common law exceptions. *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1237 (7th Cir.1986) (holding that Congressional intent to eliminate employment discrimination justified the "liberalization" of common law successorship rules "in favor of victims of discrimination in employment"). *Accord: Upholsterers',* 920 F.2d at 1326 (citing *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)).

■ Three factors determine whether the purchasing corporation is liable for employment discrimination judgments against the seller: (1) whether the purchaser had prior notice of the claim against the predecessor; (2) whether the predecessor is able to provide the relief requested; and (3) whether there has been a sufficient continuity in the business operations of the successor. *Wheeler,* 794 F.2d at 1236.

■ "The first two factors are 'critical' because of the inequity of holding a successor liable when 'the predecessor is fully

capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.'" *Id.* (quoting *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 750 (7th Cir.1985)). By contrast, "[w]hen the successor company knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment obtained against it, the presumption should be in favor of successor liability." *EEOC v. Vucitech,* 842 F.2d 936, 945 (7th Cir.1988).

██ Under the third factor, the court must consider several sub-factors: (1) whether the new employer uses the same plant; (2) whether it uses the same or substantially the same workforce; (3) whether it uses the same or substantially the same supervisors; (4) whether the same jobs exist under substantially the same working conditions; (5) whether it uses the same machinery, equipment, and methods of production; and (6) whether it produces the same product. *Wheeler,* 794 F.2d at 1236 n. 7 (citing *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1094 (6th Cir.1974)).

## III. ANALYSIS OF THE *WHEELER* FACTORS

### A. Whether RBK had Prior Notice of the Claim against SWP

██ RBK makes several arguments that relate to its notice of the claim against SWP. For example, RBK argues that three of its shareholders, Andrew Swihart, Gale Shaffer, and Sandra Korenstra, are all innocent third parties who were not involved in the ownership of SWP and should not suffer the consequences of the judgment entered against SWP. Ultimately, however, RBK admitted the central issue at the May 11, 2001, hearing: that it had full and complete knowledge of the underlying judgment against SWP.

██ Whether or not the shareholders of RBK were also shareholders of SWP is not an issue in the *Wheeler* test.[2] Nonetheless, RBK makes the argument a point of contention (Response at 9–10) and an analysis of it here only serves to highlight the closeness of all of RBK's shareholders with SWP, the underlying claim, the foreclosure, and RBK's purchase of SWP's assets.

RBK does not dispute that Roger Korenstra, Bruce Korenstra's brother, is a shareholder of both SWP and RBK. Roger knew about the judgment in favor of SWP's former employees and the EEOC because he was a shareholder of SWP; he was the brother of Bruce, the president of SWP; and Roger testified on behalf of SWP at the trial. In addition, Roger and his brother attended the May 4, 2000 meeting with the bank where they decided to withdraw their financial support of SWP because of the judgment.

Sandra Korenstra was never a shareholder in SWP, but her husband Bruce was a shareholder and president of the company. For a period of time, Bruce also acted as general manager of SWP. Sandra testified at the hearing that she was never involved with SWP, but it is difficult for this Court to believe that she did not know of the judgment. RBK goes to great lengths to assert that Bruce "was emotionally upset and depressed after the judgment was rendered ..." RBK's Response at 12. If this is true, then the Court finds

2. RBK's Response (p. 9) argues that the EEOC must demonstrate, pursuant to *Travis v. Harris,* 565 F.2d 443 (7th Cir.1977), that RBK and SWP share common shareholders and directors and that only RBK existed at the completion of the transfer. *Travis* is not the proper standard for determining the successor's liability for employment discrimination judgments. *Wheeler* provides the proper standard as RBK admitted at the hearing.

it highly unlikely that his wife would not know about Bruce's depression and the cause for it. Furthermore, there was no evidence that Sandra and Bruce never talked to each other, or that they never discussed business.

RBK also argues that Bruce was not involved in RBK. Bruce sold all of his shares in RBK to Sandra (and Gale Schaffer) on June 26, 2000. Two days later, though, Bruce made an offer to buy SWP's assets even though he was no longer technically part of RBK's ownership. The Court finds that it is highly likely that Bruce was acting on behalf of his wife and the other shareholders of RBK when he made that offer. Armey and Lake City Bank understood that Bruce's offer was on behalf of RBK. Sandra and Bruce also attended a meeting with the bank on June 30, 2000, where Bruce stated that he would put together another offer on SWP's assets. All of the credible evidence points to Sandra's complete knowledge and cooperation with the business dealings of her husband. The Court finds that she knew of the judgment against SWP, and that Bruce, someone with undeniable knowledge of the judgment, continued to play a part, at least initially, in the business of RBK.

Andrew Swihart testified under oath at his September 28, 1999, deposition that he was a shareholder of SWP. Specifically, Swihart testified that he became a shareholder on January 1, 1999; that he also became treasurer of SWP on that date; and that out of a total of 100 shares in SWP, he owned 20 shares, Gale Shaffer owned 20, Bruce Korenstra owned 30, and Roger Korenstra owned 30.[3] At his deposition, Swihart explained that he was

SWP's controller from November 1996 until January 1998. Then he became SWP's general manager, replacing Bruce Korenstra. He testified that he had attended the monthly shareholder meetings (along with Bruce and Roger Korenstra and Gale Schaffer) since April 1998. Also during his deposition, he identified Exhibit 1, a "Written Consent for Annual Meeting of the Board of Directors of SWP, Inc." Exhibit 1 appointed the officers of SWP, Inc. for 1999 as follows: Bruce Korenstra, President; Gale Schaffer, Vice President; Roger Korenstra, Secretary; Andrew Swihart, Treasurer. All four signed the document showing their consent as directors of SWP and their willingness to serve as officers. According to his September 28, 1999, deposition testimony, then, Swihart was a shareholder of SWP, a member of the board of directors, an officer of the corporation, and the general manager.

Despite this evidence, Swihart testified under oath at the May 11, 2001, hearing that he was *never* a shareholder of SWP. When the EEOC then confronted him with his prior deposition testimony, he explained that the Korenstras were thinking of making him a shareholder, but that "this never officially really happened because I did not want any part of SWP after this deposition, and nothing had legally taken place." Transcript at 59–60. His September 1999 deposition testimony, however, said that he had already been a shareholder since January 1, 1999, not that he was about to become a shareholder. In addition, the EEOC had documents showing that Swihart was a director of SWP and one of its officers. Swihart did not dispute or explain the document. One document supports Swihart's story. The

---

**3.** If Swihart's September 28, 1999, testimony is to be believed, then the ownership of SWP was exactly the same as the ownership of RBK in terms of persons involved and numbers of shares, with one exception: Sandra

Korenstra owned 30 shares of RBK in place of her husband, Bruce. *See* § I.D. above. The Court finds that this scenario is the more credible version of the facts.

June 21, 2000, Turnover Agreement between Roger and Bruce Korenstra and Lake City Bank listed Roger and Bruce as the sole shareholders of SWP. Overall, though, the Court finds that Swihart is not credible on this point. The Court cannot reconcile his various representations under oath based on the information in the record. In the opinion of the court, the weight of the evidence demonstrates that Swihart was a shareholder, director, officer, and general manager of SWP.

Even if the Court were to credit Swihart's latest testimony, and it does not, the issue is not whether Swihart was a shareholder of SWP, but instead whether he knew about the judgment. Swihart did not testify on behalf of SWP at trial, but he did testify at a deposition during discovery in 1999. His testimony concerned the financial condition of the company. He was the general manager, treasurer, and a member of the board of directors of SWP at the time of the jury's verdict. He attended SWP shareholder meetings where the amount of potential exposure from the sexual harassment claims was discussed. He attended several meetings with the bank on behalf of SWP, and he calculated profit and loss statements on behalf of the company. Most importantly, he admitted at his later deposition that he knew about the judgment. The Court finds that there was no other person associated with SWP who had a better understanding of the assets and liabilities of SWP, including the judgment, than Swihart.

For the same reasons discussed with respect to Swihart's testimony, the Court finds that Gale Schaffer was a shareholder of SWP. Regardless of his ownership status, though, Schaffer was the plant manager at SWP. Some of the plaintiffs had reported the sexual harassment problem directly to him and he had disciplined one employee in SWP's human resource department in relation to the events surrounding the sexual harassment. He was "second in command" to SWP's general manager and testified at trial on behalf of SWP. In light of his extensive involvement in the management of SWP, the Court concludes that it is inconceivable that Schaffer would not have known of the judgment entered against SWP.

The Court finds that each RBK shareholder, individually and collectively, had full knowledge of the judgment against SWP at the time RBK bought SWP's assets and the weight of the evidence supporting this finding is substantial. This fact weighs heavily in favor of successor liability.

**B. Whether SWP is Able to Provide the Relief Requested**

■ It is undisputed that SWP is currently unable to pay the judgment. The bank sold almost all of SWP's assets on July 7, 2000. According to the closing sheet of the sale, only 13,887.35 was returned to SWP after RBK bought the assets. Swihart testified that SWP used this money to pay taxes and had no money left after it paid the taxes. RBK admits that SWP's net worth is "zero."

More importantly, the owners of RBK knew that SWP could not pay the judgment after the sale of its assets. That was their intention. RBK argues that the price it paid for SWP was more than fair. It points to the fact that the bank rejected the initial $650,000 offer, and refused to sell SWP's assets until RBK paid $701,000. RBK's Response at 15 (noting that the bank "rejected out of hand RBK's first offer contemplating a purchase price below the full amount of SWP's secured indebtedness").

A closer look at the balance sheet of the sale, though, demonstrates that the increased price only served to better the financial condition of the investors of both

SWP and RBK: Roger Korenstra and his brother Bruce (or his wife). The balance sheet is attached to the bank's July 14, 2000, letter to Andrew Swihart, in his position as general manager of SWP. The balance sheet shows that RBK's purchase price went to pay most of SWP's debts and financial obligations, such as SWP's loans with Lake City Bank. SWP's loans from the bank were personally guaranteed by Roger and Bruce. RBK's higher price for SWP only meant that the bank received full repayment on its loans and, more importantly, Roger and Bruce would not be personally responsible for it.[4] In addition, RBK also paid a higher price so that SWP could meet payroll and make 401k contributions for its employees, who all came to work for RBK. The purchase price also covered SWP's outstanding checks and the attorney fees for the transaction. The only part of the purchase price that remained for SWP was $13,887.35, which SWP used to pay taxes.

In short, RBK came up with enough money so that RBK could continue SWP's business and, along with its investors, be in a better financial condition after the sale. The sale left SWP with no money to pay the judgment, the only debt not important to the continuing financial stability of RBK and the Korenstras.

Furthermore, the evidence is overwhelming that the shareholders of SWP and RBK wanted it that way. SWP planned to have the bank foreclose on SWP; then SWP shareholders would "form a new corporation and buy the assets back." The purpose of the plan was to "start up a new company to shed this liability." Contrary to RBK's assertions, RBK's shareholders were not innocent third parties. They were separate and distinct from SWP only in form, but not in reality. RBK's stockholders knew the nature and the extent of the judgment against SWP. They knew every aspect of SWP's financial situation; in fact, Andrew Swihart prepared the books for SWP. They fully expected and intended to shed liability for the judgment by passing the company through a friendly foreclosure sale that would leave the company intact, but without the judgment.[5]

■ RBK makes a second argument under this factor. It argues that SWP was near bankruptcy at the time of the judgment, and that the EEOC could not have collected its judgment against SWP. RBK argues that by waiting until RBK bought SWP's assets and proceeding against RBK, the EEOC would receive a windfall. *Musikiwamba* cautioned against successor liability in this circumstance:

> Imposing liability on a successor when a predecessor could have provided no relief whatsoever is likely to severely inhibit the reorganization or transfer of assets of a failing business.... [T]hat company will have difficulty selling its assets or business for a [decent] price because successors will be unwilling to assume a business involved in substan-

---

4. RBK admits that Bruce Korenstra wanted "to reduce his exposure arising under a personal guaranty in the event a deficiency resulted." Response at 13. The Court understands this desire, but the higher purchase price does not mean that the transaction was fair and non-fraudulent. The higher purchase price paid by Roger and Sandra Korenstra benefitted Roger and Bruce (Sandra's husband), who would not be personally responsible to the bank.

5. The EEOC did not formally argue that SWP and RBK had acted fraudulently, and RBK did not address an argument based on fraud. Consequently, the Court does not make a conclusive finding of fraud. Nonetheless, the Court does find that many of SWP's and RBK's actions could be viewed as attempts to defraud a judgment creditor.

tial time-consuming and expensive litigation when the assets themselves lack substantial value.

*Musikiwamba,* 760 F.2d at 751. *Accord:* "[The] purpose of successor liability is 'not to provide windfalls' for people who were unable to recover from the predecessor because the predecessor had no means of satisfying the claim." *Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Tasemkin, Inc.,* 59 F.3d 48, 51 (7th Cir.1995) (quoting *Steinbach v. Hubbard,* 51 F.3d 843, 847 (9th Cir.1995)).

The Court notes *Musikiwamba*'s caution, but finds that the facts of this case do not support RBK's assertion that SWP was worthless. SWP shareholders Roger Korenstra and Bruce Korenstra (through his wife Sandra) paid $700,000 so that RBK could buy SWP's assets. Why would they pay that much money to continue with a business that was near bankruptcy? The money went to pay SWP's outstanding loans with the bank. After continuing SWP's business for less than one month, RBK paid $500,000 back to its investors. The EEOC also presented evidence that Andrew Swihart engaged in "aggressive accounting" to make it appear that SWP had less profit than it really had. Furthermore, Swihart projected profits of between $200,000 and $300,000 for fiscal year 2000. In light of these facts, the Court finds RBK's claims that SWP was nearly bankrupt to be unsupported by the evidence.

Moreover, even if RBK's assertions of SWP's financial difficulties were true, it is one factor among many, and is insufficient to warrant a different outcome. *Chicago Truck Drivers,* 59 F.3d at 51 (reversing a finding of no successor liability even though predecessor was bankrupt because of "the apparent nature of the acquisition . . ., which clearly had the effect, intended or no, of frustrating unsecured creditors while resurrecting virtually the identical enterprise"). The second factor weighs in favor of successor liability.

## C. Whether There Has Been a Sufficient Continuity in Business Operations

■ The Court will now analyze each of the six subfactors that comprise the third factor of the *Wheeler* test. This third factor is not "critical" like the first two factors. Nonetheless, the Court finds that this factor also weighs heavily in favor of successor liability.

### 1. Whether RBK Uses the Same Plant

RBK admitted at the hearing that it operates from the same location in the same building that SWP used. Swihart also admitted this fact at his deposition. This factor weighs in favor of a finding of continuous business operations.

### 2. Whether RBK Uses the Same or Substantially the Same Workforce

When RBK started its operations on July 10, 2000, it hired all of SWP's employees. Deposition Exhibit 46 is a list of all RBK employees as of October 24, 2000. On that date 54 of a total 66 employees (or 82%) had previously worked for SWP, and were hired by RBK on July 10, 2000. At the hearing, Swihart testified that as of the date of the hearing only 40% of RBK's employees had previously been SWP employees. He did not have any documents to support his testimony, and it was clear at the hearing that he was making a guess off the top of his head. Given Swihart's other attempts to shade the facts in his favor, the Court gives limited credence to Swihart's off-the-cuff guess. Nonetheless, the overall evidence suggests that RBK employed the entire SWP workforce, subject only to normal employee attrition over

the passage of time (especially considering the tight labor market in this part of the country during 2000 and the first quarter of 2001).

### 3. Whether RBK Uses the Same or Substantially the Same Supervisors

Swihart placed asterisks next to the supervisory employees in the employee list that is Deposition Exhibit 46. Exhibit 46 demonstrates that as of October 24, 2000, 17 out of 18 RBK supervisors had previously worked for SWP. Swihart testified that most supervisors retained the same position as they had with SWP.

### 4. Whether the Same Jobs Exist under Substantially the Same Working Conditions

RBK admitted this fact at the hearing and Swihart's testimony supports this admission.

### 5. Whether RBK Uses the Same Machinery, Equipment, and Methods of Production

At the hearing, RBK admitted that it used at least some of the same machinery that SWP had used. Swihart testified at his deposition that RBK purchased all of SWP's machinery and currently uses the same method of production that SWP used.

### 6. Whether RBK Produces the Same Product

At the hearing, RBK admitted that it produces wood cabinetry, just like its predecessor SWP. It argued, however, that RBK produces "higher end" cabinetry compared to SWP. RBK explained that its customers have more choices of styles and colors than they had with SWP. RBK makes all of the same products that SWP did, but RBK also makes library shelves, wood rooms, and furniture. The Court finds the differences between SWP's prod-

ucts and RBK's products to be minimal. In fact, RBK uses many of SWP's old vendors. Swihart admitted that RBK uses 50 vendors and that out of those 50, 35 had been vendors of SWP.

In addition, RBK's products were similar enough to SWP's to retain many of SWP's customers. When it purchased SWP's assets, RBK completed all of SWP's unfinished customer orders. Certainly it is likely that RBK added some customers and dropped others. However, it continued operating under the name Superior Wood Products, and RBK did not inform its customers of the new ownership if they did not ask. By retaining the same trade name, RBK identified itself with SWP and projected the image that its products originated from the same source as SWP's products.

In conclusion, the Court finds that every factor and subfactor points to successor liability under *Wheeler*.

## IV. ANALYSIS OF RBK'S ARGUMENTS AGAINST SUCCESSOR LIABILITY

RBK raises several arguments external to the *Wheeler* analysis as to why successor liability should not apply in this case. First, RBK reasons that successor liability should not attach to it since it did not purchase SWP's assets directly from SWP, but instead purchased them through a commercially reasonable foreclosure sale from the bank. Second, RBK argues hypothetically that the EEOC could not collect on its judgment if RBK had not purchased SWP's assets and continued SWP's business. Third, RBK asserts that the EEOC sat on its rights and that it would be unfair to impose successor liability in light of the EEOC's slowness. Fourth, RBK asks the Court to weigh all of the extenuating circumstances in the balance between the fluidity of corporate assets in commerce versus the collectibility of em-

ployment discrimination judgments. All of these arguments fail to persuade the Court.

### A. The Intervening Foreclosure Does Not Cut Off Successor Liability

■■■ RBK emphasizes the fact that it purchased SWP's assets from Lake City Bank after Lake City Bank had foreclosed on its loans to SWP. Specifically, RBK asserts the following in its Response:

"There is no legal authority holding that successor liability should attach against a separate and distinct entity after a bank has repossessed a judgment debtor's corporate assets after default." RBK's Response at 3.

"The EEOC is unable to cite to any authority which allows a Court to join a party post-judgment pursuant to Fed. R.Civ.P. 25(c) where a third party bank repossessed the judgment debtor's assets and sold them to a third party." RBK's Response at 14.

"The EEOC can cite no case where a bona fide purchaser for value was held liable for an award of compensatory or punitive damages merely because it happened to be the party that purchased the judgment debtor's assets at a forced sale." RBK's Response at 17.

RBK's argument fails for two reasons. First, the argument falsely assumes that RBK is, in fact, a separate and independent third party that qualifies as a bona fide purchaser or that has acted in good faith. This Court has already discussed the near identity in ownership between RBK and SWP, RBK's knowledge of the judgment against SWP, and RBK's attempt to shed liability for the judgment through foreclosure. A reasonable person in the trade would not try to dodge responsibility for the judgment through the ruse of foreclosure, especially in light of the well-settled case law of the Seventh Circuit regarding the liberalized standard

for successor liability for employment discrimination judgments. Far from being innocent third parties, the Court finds that RBK's actions are closer to being fraudulent than they are to being innocent, honest, and bona fide. The factual underpinning of RBK's argument is lacking.

RBK's argument fails for a second reason, this time based on the law. The EEOC has cited solid case law in which successor liability was imposed on a purchaser who bought the assets at a foreclosure sale. RBK's argument that a foreclosure sale cuts off all possibility of successor liability is simply incorrect.

■■■■■ "The mere fact that the transfer of assets involved foreclosure on a security interest will not insulate a successor corporation from liability where other facts point to continuation." *Stoumbos v. Kilimnik*, 988 F.2d 949, 962 (9th Cir.1993). "Successor liability may be imposed even where the business assets were purchased pursuant to a foreclosure sale." *Fletcher Cyclopedia of Corporations* § 7122, at 254 (Perm. Ed.1999). *Accord: Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 267–68 (1st Cir.1997) (citing cases from several jurisdictions that "overwhelmingly" support this holding).

*Upholsterers'* involved a foreclosure sale of the selling corporation's assets. *Upholsterers'*, 920 F.2d at 1325. The court held that liability could be imposed on the purchasing corporation even though none of the purchasing corporation's stockholders were stockholders of the selling corporation. *Id.* at 1325, 1329–30. The *Wheeler* factors and their focus on the purchasing corporation's knowledge of the situation provided the analysis. *Id.* at 1329–30. The intervening foreclosure played no part in the decision. *Id. Accord: Chicago Truck Drivers*, 59 F.3d at 50 (following *Upholsterers'* and rejecting the position that an intervening transaction prohibits successor liability).

■ RBK argues further that Indiana's version of the Uniform Commercial Code serves to extinguish the EEOC's judgment once SWP's assets are purchased at a foreclosure sale. The argument goes as follows: Ind.Code § 26–1–9–504 (UCC § 9–504), deals with foreclosure by a secured party after default on a loan by the borrower. After the secured party forecloses on the collateral used to secure the loan, it may sell the collateral and apply the proceeds toward the loan balance. Ind.Code § 26–1–9–504(4) (UCC § 9–504(4)) provides that "when collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, and *discharges the security interest under which it is made and any security interest or lien subordinate thereto.*" (Emphasis added.) RBK argues that the foreclosure sale not only discharged the bank's security interest in SWP's assets but also discharged the EEOC's judgment.

This argument fails as a matter of law. By its own terms, Ind.Code § 26–1–9–504(4) (UCC § 9–504(4)) discusses discharge of security interests and liens in collateral. It does not affect the underlying debt. *Accord: Ed Peters Jewelry Co.,* 124 F.3d at 267 (holding that "although foreclosure by a senior lienor often wipes out junior-lien interests in the same collateral . . . it does not discharge the debtor's underlying obligation to junior lien creditors"). Thus, the question of whether RBK owes for the judgment entered against SWP, as SWP's successor, is in no way affected by Ind.Code § 26–1–9–504(4) (UCC § 9–504(4)) since the judgment was a debt, not a security interest in collateral.

## B. RBK's Hypothetical Argument is Unpersuasive

RBK argues that if it had not purchased SWP's assets, then the EEOC could have only shut SWP down and forced a sale of SWP's assets. RBK's Response at 15–16. Without RBK as a buyer, the EEOC could not have secured as high a price from another buyer. *Id.* This argument involves a hypothetical situation. In reality, RBK bought SWP's assets, used them to continue SWP's business, paid large amounts of money to its investors, and attempted to avoid one judgment creditor, the EEOC. The EEOC cannot now collect on its judgment against SWP because SWP's has no assets following the sale to RBK. The Court will not consider the hypothetical further.

## C. RBK Asserts that the EEOC Sat on its Rights, but RBK has Suffered No Prejudice

■ RBK asserts throughout its Response that the EEOC sat on its rights, Response at 1, 13–14, 15–16, 18, but offers no case law to support its claim that the EEOC acted unfairly, or that the *Wheeler* analysis should be affected in any way by the EEOC's actions.

The judgment was due and payable as of March 20, 2000, when the Court entered its final judgment in this case. Previously, the EEOC had sought an injunction to ensure the collectibility of its judgment. It filed a Praecipe for Writ of Execution on April 19, 2000. Thus, SWP and RBK knew the EEOC had a judgment in its favor and that it intended to collect on it. Nonetheless, SWP and RBK proceeded with their plan to shed liability for the judgment. They made no effort to pay any of the judgment, before or after the sale. When it became clear to the EEOC that the sale was not an effort by SWP to meet its obligations, but instead a plan to evade them, the EEOC conducted the necessary discovery and filed its motion to join RBK as a defendant. RBK cannot reasonably claim that it was surprised

when the EEOC pursued its judgment after the foreclosure sale. RBK and SWP knew from the EEOC's motion for injunction, filed just minutes after the jury's verdict, that the EEOC had concerns about SWP's deliberate intent to skirt its legal responsibility. Even if the foreclosure sale gave the EEOC a second chance to obtain payment on its judgment, nothing is wrong or unfair with that outcome. "[A] second chance is precisely the point of successor liability." *Chicago Truck Drivers*, 59 F.3d at 51.

### D. The Balance of Factors Does Not Warrant Relief from Punitive Damages

■ At the hearing, RBK asked the Court to keep the "balance" that is discussed in *Vucitech* and *Upholsterers'* in mind and absolve RBK of responsibility for the punitive damage award against SWP. Those cases discuss "the balance between the need to effectuate federal labor and employment discrimination policies and the need, reflected in the traditional common law rule, to facilitate the fluid transfer of corporate assets." *Upholsterers'*, 920 F.2d at 1326. *Accord: Vucitech*, 842 F.2d at 944–45. RBK argues that *Wheeler*, *Vucitech*, and *Upholsterers'* were decided before Congress amended 42 U.S.C. § 1981a to allow recovery for punitive damages. Thus, those cases did not contemplate the different kind and larger amount of damage awards that are now ordinary in employment discrimination cases.

*Musikiwamba* discussed the fairness of imposing liability for punitive damages on successors. *Musikiwamba* held that a purchasing corporation could be liable as a successor for employment discrimination claims under 42 U.S.C. § 1981 that had been brought against the selling corporation. *Musikiwamba*, 760 F.2d at 753.

Although *Musikiwamba* gives this Court the discretion to limit successor liability according to RBK's request, *id.* at 749, the facts of this case do not warrant it. This case presents none of the reasons discussed in *Musikiwamba* for absolving RBK from liability for the punitive damage portion of the judgment. In this case, RBK is not an innocent third party. Its shareholders (or spouses) were also shareholders of SWP, and they participated at trial as employees and shareholders of SWP. They had full knowledge of the judgment and its amount before the foreclosure sale. They also knew about SWP's finances. They structured and planned the transaction so that SWP could pay the debts necessary to continue the business, but would have nothing left to pay the judgment. If, after the sale, SWP had no money to pay the judgment, then RBK can only blame itself.

Furthermore, successor liability for punitive-type damages is not uncommon. *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 743, 748 (7th Cir.1994), affirmed a successor's liability for a back pay award that was doubled due to the employer's willfulness. The Court finds no reason to absolve RBK of responsibility for the punitive damage award in this case.

## V. CONCLUSION

For the foregoing reasons, this Court **RECOMMENDS** that the EEOC's Motion to Join RBK as a defendant under Fed. R.Civ.P. 25(c) [Doc. No. 95] should be **GRANTED**. In addition, RBK had previously filed a Motion to Dismiss on January 5, 2001. At hearing, counsel for RBK agreed that the motion was now moot, and this Court agreed. Consequently, the Court **RECOMMENDS** that RBK's Motion to Dismiss [Doc. No. 103] should be **DENIED AS MOOT**.

NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R.Civ.P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. See *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Lerro v. Quaker Oats Co.,* 84 F.3d 239 (7th Cir.1996); *Lockert v. Faulkner,* 843 F.2d 1015 (7th Cir.1988); *Video Views, Inc. v. Studio 21 Ltd.,* 797 F.2d 538 (7th Cir.1986).

SO ORDERED.

June 8, 2001.