

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-6-2004

# In Re:Digital Island

Precedential or Non-Precedential: Precedential

Docket No. 03-1055

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re:Digital Island " (2004). *2004 Decisions.* Paper 962.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/962

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Case No: 03-1055

IN RE: DIGITAL ISLAND
SECURITIES LITIGATION

WILLIAM BLAIR MASSEY, Lead
Plaintiff
as representative of a class consisting
of all holders of the common stock of
Digital Island, Inc.,

Appellant

_____

On Appeal From The
United States District Court For The
District of Delaware
(Civil Action No. 02-cv-00057)
The Honorable Gregory M. Sleet,
District Judge

_____

Argued November 4, 2003

_____

Before: MCKEE, SMITH, and WEIS,
*Circuit Judges*

(Opinion Filed February 6, 2004)

Jeffrey G. Smith
Robert Abrams [Argued]
Wolf, Haldenstein, Adler, Freeman & Herz
270 Madison Avenue
New York, NY 10016

Pamela S. Tikellis
Chimicles & Tikellis

One Rodney Square
P.O. Box 1035, Suite 500
Wilmington, DE 19899

Counsel for Appellants

Jerrold J. Ganzfried [Argued]
Mark D. Wegener
Howrey, Simon, Arnold & White
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Philip A. Rovner
Potter, Anderson & Corroon
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, DE 19801

Counsel for Appellees

_____

OPINION
_____

SMITH, *Circuit Judge*

This securities class action lawsuit arises out of the acquisition of Digital Island, Inc. by Cable & Wireless, PLC ("C&W"). Pursuant to a May 14, 2001 Merger Agreement between Digital Island and C&W, Dali Acquisition Corp. ("Dali"), a wholly-owned subsidiary of C&W, made a cash tender offer to shareholders of Digital Island under which it acquired 80 percent of the shares of Digital Island. Dali was thereafter merged into Digital Island, which survived as a wholly-owned subsidiary of C&W.

Plaintiffs filed a Consolidated Amended Class Action Complaint (the

"Complaint") on May 15, 2002. Plaintiffs in this case represent a class comprised of all persons, other than the named defendants and certain related parties, who owned Digital Island common stock during the relevant period and who received the tender offer.[1] Defendants are Digital Island, members of Digital Island's Board of Directors during the relevant time period, including Digital Island's CEO, Ruann Ernst (the "Directors"),[2] C&W, C&W's CEO, Graham Wallace,[3] and Dali. Plaintiffs allege that, in connection with the tender offer, Defendants made misleading statements and failed to disclose material information in violation of Section 14(e) of the Securities and Exchange Act of 1934 (the "'34 Act"), as amended by the Williams Act of 1968. 15 U.S.C. § 78n(e). Plaintiffs further allege that the Directors received "extra consideration" for their shares in violation of Section 14(d)(7) of the '34 Act, 15 U.S.C. § 78n(d)(7), and Securities and Exchange Commission ("SEC") Rule 14d-10, the so-called "Best Price Rule," 17 C.F.R. § 240.14d-10(a). Plaintiffs allege both individual violations by Defendants of these provisions, as well as "control person liability" under Section 20(a) of the '34 Act. 15 U.S.C. § 78t(a).

The District Court dismissed Plaintiffs' consolidated amended complaint, with prejudice, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4. *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546 (D. Del. 2002). By a subsequent order, the District Court denied Plaintiffs' motion, pursuant to Fed. R. Civ. P. 59(e), which sought to alter the court's judgment and to permit Plaintiffs to file an amended complaint under Fed. R. Civ. P. 15(a). Because we conclude that Plaintiffs' proposed Second Consolidated Amended Class Action Complaint (the "proposed amended Complaint") does not articulate a viable theory of fraud, we will affirm both orders of the District Court.

I.

The following facts are drawn from the proposed amended Complaint and from Digital Island's Securities and Exchange Commission ("SEC") Form 14D-9, which is referenced in the proposed amended Complaint and included in the

---

[1] Individual complaints were filed by shareholders of Digital Island in late January and early February of 2002. On April 16, 2002, the District Court granted Plaintiffs' Joint Motion for Consolidation, Appointment of Lead Plaintiff and Appointment of Lead Counsel.

[2] The other Directors are: Charlie Bass, Christos Cotsakos, Mary Cirillo-Goldberg, G. Bradford Jones, Robert Marbut, Shahan Soghikian, Don Reed, Mike McTighe, Robert Drolet, Avery Duff, and Marc Lefar.

[3] Defendant Wallace also served as a member of Digital Island's board beginning on July 16, 2001.

Joint Appendix. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of documents required by law to be filed with the SEC). Digital Island provides a global e-business delivery network and suite of services for enterprises that use the internet to deploy business applications and conduct e-commerce. Digital Island began searching for a potential acquirer in August of 2000, at which time representatives of Digital Island contacted representatives of C&W to gauge C&W's interest in a strategic partnership with Digital Island. In March of 2001, C&W indicated that it was interested in a potential business combination with Digital Island. In April of 2001, C&W delivered an initial draft of the Merger Agreement and made an initial offer to purchase Digital Island for $2.25 a share. After considering the offer and meeting with its financial advisors, Digital Island advised C&W that it was prepared to begin negotiations, provided that the offer price was increased to at least $3.25.

Negotiations between Digital Island and C&W continued through April and into May, but C&W would not agree to raise its offer to $3.25 per share. On May 10, 2001, Digital Island announced an agreement to provide certain business services to Microsoft Corporation. The price of Digital Island's stock rose that day from $2.00 per share to $3.69 per share. On May 11, 2001, representatives of C&W indicated that C&W's board of directors had preliminarily approved an offer of $3.40 per share.[4] Digital Island made a counter-proposal of $4.10 per share, which was rejected by C&W. On May 13, 2001, the Digital Island board met and voted unanimously to approve the execution of the Merger Agreement with a per share tender offer price of $3.40 and to recommend to the shareholders that they accept the tender offer.

On May 14, 2001, Digital Island and C&W executed the Merger Agreement, which contemplated a first step tender offer followed by a second step merger. Under the tender offer, shareholders who tendered their shares were to receive $3.40 per share. Under the merger, all remaining shares of Digital Island would be canceled, and shareholders would receive $3.40 per share. The tender offer period expired on June 18, 2001, and on June 19, 2001, Digital Island announced that approximately 80 percent of its outstanding stock had been tendered.

Plaintiffs' Section 14(e) claim is based on two significant business deals that were announced immediately after the expiration of the tender offer. On June 20, 2001, Digital Island announced a major business agreement with Bloomberg LP, and on July 2, 2001, Digital Island announced another major business agreement with Major League Baseball

---

[4] According to information submitted in the Joint Appendix, Digital Island's stock dropped to $3.13 at the close of trading on May 11.

("MLB"). According to Plaintiffs, both the Bloomberg and MLB deals had substantial value to Digital Island, and, if disclosed, would have substantially influenced the shareholders' decision to tender their shares.[5]

Plaintiffs allege that Defendants knew of the Bloomberg and MLB deals prior to expiration of the tender offer, but deliberately or recklessly failed to disclose the deals until after the expiration of the tender offer. Plaintiffs argue that Defendants had an affirmative duty to disclose the Bloomberg and MLB deals, or, alternatively, that Defendants' failure to mention those deals in the tender offer and the Schedule 14D-9 rendered those documents materially misleading. Plaintiffs allege that Defendants were motivated to suppress the Bloomberg and MLB deals because the success of the tender offer and resulting merger created a windfall for Defendants that was not enjoyed by Digital Island's other shareholders. Specifically, Plaintiffs allege that, pursuant to the merger, the Directors received substantial cash payments for outstanding options to purchase Digital Island common stock, as well as for their shares of restricted common stock. Additionally, Plaintiffs allege that CEO Ernst had executed a lucrative contract for employment to serve as President and CEO of the surviving entity.[6]

> Such extra consideration was given to Digital Island officers and directors in order to induce them to support the Offer to Purchase at the $3.40 price per share and to withhold the announcement of the Bloomberg and Major League Baseball deals until after the expiration of the Offer to Purchase in order to preclude the need for C&W to increase the consideration in the Offer to Purchase.

---

[5] Plaintiffs' prediction is based on the increase in value of Digital Island stock that occurred after announcement of the Microsoft deal. The actual disclosure of the Bloomberg and MLB deals does not appear to have affected the price of Digital Island stock. Plaintiffs explain that the success of the tender offer on June 19 effectively froze Digital Island's share price at $3.40 per share because, under the merger agreement, all outstanding shares of Digital Island were to be automatically cashed out at that price. Nevertheless, Plaintiffs allege very few facts from which any meaningful comparison can be drawn between the Microsoft deal on the one hand, and the Bloomberg and MLB deals on the other.

[6] The proposed amended Complaint alleges that "five of the officers of Digital Island, including Ms. Ernst, received lucrative employment contracts in connection with the merger which entitled them to generous salary and option packages." Defendants point out that, according to the Schedule 14D-9 referenced in the Complaint, only one named Defendant, CEO Ernst, received such a contract. Plaintiffs did not respond.

App. at 338. According to Plaintiffs, disclosure of the Bloomberg and MLB deals threatened to derail the merger with C&W:

> If the announcement induced more than 50 percent of Digital Island stockholders not to tender their shares, the Merger would not be consummated and the Digital Island officers would lose their lucrative employment agreements, as well as the extra consideration for their shares. Thus, any announcement concerning the Bloomberg or Major League Baseball Deals carried with it the threat of undermining the Merger Agreement.

App. at 352.

In addition to their Section 14(e) claim, Plaintiffs allege that, by virtue of these cash payments and the Ernst employment agreement, the Directors received "extra consideration" for their shares in violation of Section 14(d)(7) of the '34 Act and the SEC's Best Price Rule. Plaintiffs allege individual violations by Defendants of Sections 14(e) and the Best Price Rule, as well as "control person liability" under Section 20(a) of the '34 Act.[7]

---

[7] The Complaint also alleges that Defendants issued a false and misleading proxy statement in violation of Section 14(a) of the '34 Act. Plaintiffs do not appeal dismissal of this claim.

The District Court dismissed the Complaint on September 10, 2002, for failure to state a claim. The District Court held that Plaintiffs' Section 14(e) claim failed to meet the heightened pleading requirements of the PSLRA in two respects: (1) the Complaint did not identify with specificity the statements that were allegedly misleading, and (2) the Complaint did not plead facts giving rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b). The District Court further held that Plaintiffs failed to state a claim for violation of the Best Price Rule because that provision applies only to payments made during a tender offer, and the extra consideration alleged by Plaintiffs was received pursuant to agreements executed prior to the tender offer. Finally, the District Court dismissed Plaintiffs' "control person liability" claim because (1) the predicate violations on which that claim was based (*i.e.*, the Section 14(e) and Best Price Rule claims) were dismissed, and (2) because Plaintiffs failed to allege facts sufficient to establish control and/or culpable participation.

Plaintiffs filed a Motion to Alter Judgment and For Leave to File An Amended Complaint under Fed. R. Civ. P. 59(e) and 15(a). The District Court denied Plaintiffs' motion on November 25, 2002. The District Court concluded that Plaintiffs had deliberately and unreasonably delayed seeking leave to amend until after judgment had been entered on the motion to dismiss.

Plaintiffs timely appealed both orders on December 23, 2002.[8] The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. This Court has jurisdiction over the District Court's order dismissing Plaintiffs' Complaint under 28 U.S.C. § 1291 because the Complaint was dismissed with prejudice. *Manze v. State Farm Ins. Co.*, 817 F.2d 1062, 1064 (3d Cir. 1987). This Court also has jurisdiction under section 1291 over the District Court's denial of Plaintiffs' post-judgment motion for leave to amend. *See Foman v. Davis*, 371 U.S. 178 (1962); *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1203 (3d Cir. 1995). We review de novo a District Court's dismissal of a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Ramsgate Court Townhome Ass'n v. West Chester Borough*, 313 F.3d 157, 158 (3d Cir. 2002).

On December 8, 2003, after oral argument in this case, the successor entity to the merger of Digital Island and Dali filed for Chapter 11 Bankruptcy in the District of Delaware. Under 11 U.S.C. § 362(a), this filing operates to stay all proceedings against Digital Island and Dali. Digital Island is a defendant in Plaintiffs' Section 14(e) claim, and Dali is a defendant in Plaintiffs' Best Price Rule Claim. Although the stay of proceedings against Digital Island and Dali does not affect our reasoning, it does mean that our decision today does not reach either entity.

II.

Section 14(e) of the '34 Act provides, in pertinent part:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . .

15 U.S.C. § 78n(e). The District Court held that Section 14(e) requires proof of scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Both parties appear to agree.[9]

Section 14(e) is "modeled on the antifraud provisions of § 10(b) of the ['34] Act and Rule 10b-5," *Schreiber v.*

---

[8] A timely Rule 59(e) motion suspends the time in which to appeal, which then begins to run, pursuant to Fed. R. App. P. 4(a)(4), upon the entry of an order granting or denying the motion.

[9] Plaintiffs cite *Clearfield Bank & Trust Co. v. Omega Fin. Corp.*, 65 F. Supp. 2d 325, 340, 342-43 (W.D. Pa. 1999), in support of the proposition that Section 14(e) requires proof of scienter.

*Burlington Northern, Inc.*, 472 U.S. 1, 10 (1985), which require proof of scienter, *Ernst & Ernst*, 425 U.S. at 193. Because of the similarity in the language and scope of Section 14(e) and Rule 10b-5, we have in the past construed the two consistently. *E.g., Flynn v. Bass Bros. Enters., Inc.*, 744 F.2d 978, 984-85 (3d Cir. 1984) (adopting the same test of materiality for both Section 14(e) and Rule 10b-5). We therefore join those circuits that hold that scienter is an element of a Section 14(e) claim. *See, e.g., Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 605 (5th Cir. 1974) ("Congress adopted in Section 14(e) the substantive language of the second paragraph of Rule 10b-5 and in so doing accepted the precedential baggage those words have carried over the years.").

The PSLRA establishes a heightened pleading requirement for certain securities fraud cases. The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In requiring a "strong inference" of scienter, the PSLRA alters the normal operation of inferences under Fed. R. Civ. P. 12(b)(6). *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002) ("[U]nless plaintiffs in securities fraud actions allege facts . . . with the requisite particularity . . . they may not benefit from inferences flowing from vague or unspecific allegations— inferences that may arguably have been

justified under a traditional Rule 12(b)(6) analysis."); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss."). For purposes of the PSLRA, Plaintiffs may plead scienter by alleging facts that (1) establish a motive and an opportunity to commit fraud, or (2) constitute circumstantial evidence of either reckless or conscious behavior. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999). Either way, plaintiffs must plead facts "with particularity," and these facts must give rise to a "strong inference" of a knowing or reckless misstatement. *Id.* at 535.

### A.

Plaintiffs' theory of the case is that the Directors and CEO Wallace suppressed the Bloomberg and MLB deals to ensure the success of the tender offer and the subsequent merger.[10] When the tender

---

[10] We agree with the District Court that, absent a duty to correct or update misleading statements, Plaintiffs failed to identify an affirmative duty to disclose the Bloomberg and MLB deals. *Oran*, 226 F.3d at 285-86 ("Such a duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company

offer succeeded, the merger cashed out

to provide the public with all material information."). Because we conclude that Plaintiffs have failed to adequately plead scienter, we do not decide whether the proposed amended Complaint adequately specifies the statements alleged to be misleading and the reason why those statements are misleading, or whether the proposed amended Complaint properly attributes those statements to any of the Defendants in this case. *See Rockefeller*, 311 F.3d at 217-18 (discussing the pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b)).

The District Court further dismissed the Section 14(e) claim as to C&W, Dali, and Wallace, because those defendants were not affiliated with Digital Island and therefore owed no duty to Digital Island's shareholders to disclose the Bloomberg and IBM deals. Plaintiffs make no argument in their briefs that dismissal was erroneous as to C&W and Dali and have therefore abandoned these issues. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993). Plaintiffs do maintain that Defendant Wallace violated Section 14(e) by failing to disclose the two deals. Plaintiffs make no argument that Defendant Wallace owed a duty to correct or update statements that he did not make and over which he had no control. Accordingly, we will affirm the District Court's dismissal of the Section 14(e) claim as to Wallace on the grounds that he was under no duty to disclose the Bloomberg and MLB deals.

various options to purchase shares of common stock as well as shares of restricted common stock held by the Directors. According to Plaintiffs, the prospect of cashing out these holdings induced the Directors to suppress information that would have raised the value of Digital Island's shares. Such an increase, Plaintiffs allege, would have jeopardized the Merger Agreement because shareholders would not have tendered at $3.40 and C&W would not have increased the consideration offered. CEO Ernst's lucrative employment contract with the surviving entity provided her with a further inducement.

Setting aside the Ernst employment agreement, the Directors stood to gain from any increase in Digital Island's share price in the same manner as any other Digital Island shareholder, that is, by tendering their shares into the offer or by having their shares cashed out in the merger. Moreover, our reading of the proposed amended Complaint compels the same conclusion reached by the District Court: "As a result of the tender offer and merger, each [Director] was paid the face value of the options, *i.e.*, the difference, if any between the option price and $3.40." *Digital Island*, 223 F. Supp. 2d at 550. Nevertheless, Plaintiffs argue that the success of the tender offer created a windfall for the Directors because it allowed them to unload their holdings all

at once, at a guaranteed price of $3.40 a share.[11]

[11] The allegations in the proposed amended complaint emphasize the fact that the merger cashed out both vested and unvested options and restricted stock:

> First, the Digital Island officers and directors were to receive substantial cash payments in connection with the Merger for their in-the-money options to purchase Digital Island common stock. This applied to both vested and unvested options. In addition, the officers of Digital Island were to receive cash in connection with the Merger in return for certain restricted common stock which they had been granted in April 2001, several weeks prior to the Merger announcement, in return for their out-of-the money options.

App. at 351. Plaintiffs do not allege that the Directors received any sort of accelerated payment for their holdings, *i.e.*, that any payment was made prior to their vesting. Nor are there any allegations regarding the circumstances or purpose of the April 2001 option exchange program. Instead, our reading of the proposed amended Complaint leads us to the same conclusion as the District Court: the Directors received the face value of their options and restricted stock pursuant to a merger in which all outstanding securities of Digital Island were cancelled. More fundamentally, the value of these options

Granting that some value might attach to the avoidance of future risk, or that only so many shares can be unloaded on the open market without depressing the share price, Plaintiffs' theory is nevertheless a weak inference teetering on an unfounded assumption. *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001) ("Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). The inference is that the Directors feared that C&W would abandon its efforts to acquire Digital Island if the share price increased. Plaintiffs argue that this fear can be inferred from C&W's rejection of Digital Island's $4.10 counter-proposal, and from the fact that the merger agreement was hastily executed within days of the disclosure of the Microsoft deal. Whether or not this inference is reasonable under Rule 12(b)(6), the PSLRA requires a strong—as opposed to merely reasonable—inference to survive a motion to dismiss. *See Rockefeller*, 311 F.3d at 224. The inference urged by Plaintiffs is not strong, because the far

and restricted stock, whether vested or unvested, was necessarily tied to the market value of Digital Island's common stock. While other eventualities might have decreased Digital Island's share price before these holdings vested, such open-ended speculation is entirely insufficient to support a strong inference of motive under the PSLRA. *Rockefeller*, 311 F.3d at 222.

more compelling inference is that the Directors bargained aggressively with C&W, motivated solely by a desire to exploit the surge in Digital Island's stock price that followed the announcement of the Microsoft deal. If the Directors were confident of the Bloomberg and MLB deals before the merger agreement was finalized, they would certainly have disclosed those deals to support their counter-offer.[12] If instead, the Bloomberg and MLB deals were finalized after execution of the merger agreement, C&W's rejection of the counter-offer could have no bearing on how C&W would react to the deals. Rather, C&W's decision to increase the tender offer price following the Microsoft deal would indicate that C&W might respond favorably to the Bloomberg and MLB deals.

Regardless of the strength of this inference, it rests on an assumption, devoid of any factual allegation whatsoever, that the Directors would be worse off if C&W withdrew its offer. Yet Plaintiffs' theory of the case necessarily requires that disclosure of the MLB and Bloomberg Deals would have increased the market value of Digital Island stock absent the merger. Accordingly, to establish a strong inference of motive, Plaintiffs were obliged to allege some facts tending to show how the Directors could have hoped to make out better by unloading their options and restricted stock than by realizing the impact of the Bloomberg and MLB deals on their shares, either in the market or in a merger with another suitor. *See Advanta*, 180 F.3d at 540-41 (no strong inference of scienter where detailed allegations revealed that allegedly improper profits were small in comparison to defendants' stock holdings); *Burlington Coat Factory*, 114 F.3d at 1423 (noting that plaintiffs had failed to plead facts showing that allegedly improper profits were substantial in comparison to defendants' overall stock holdings and compensation).[13] Considering all the allegations in Plaintiffs' proposed amended Complaint, we agree with the District Court that "plaintiffs' theory

---

[12] Plaintiffs equivocate on when the Bloomberg and MLB deals became sufficiently certain to merit disclosure. Plaintiffs generally allege that the deals were close to completion sometime during the tender offer period. Plaintiffs, however, imply that the deals were sufficiently final sometime prior to execution of the merger agreement, insofar as Plaintiffs allege that the disclosure of the Microsoft deal was misleading because it implied that no other deals were about to be consummated. Plaintiffs also allege that C&W generally became aware of the deals by virtue of the due diligence process.

---

[13] The proposed amended Complaint further assumes, without the support of factual allegations, that other potential acquirers would not have emerged on terms comparable to those offered by C&W, or at least that the Directors feared that no other suitor would emerge.

makes little economic sense because the directors' own stock options would have been devalued if they tried to sell the company for less than full price." *Digital Island*, 223 F. Supp. 2d at 555. The proposed amended Complaint therefore does not allege facts giving rise to a strong inference that the Directors acted with scienter in not disclosing the Bloomberg and MLB deals in their statements regarding the tender offer.

The Ernst employment agreement does little to strengthen the inference of motive that can be drawn from Plaintiffs' allegations. As with the Directors' stock holdings, Plaintiffs allege no facts from which it can be inferred that the employment agreement actually created a windfall to Ernst beyond what she would otherwise realize by an increase in the value of her shares. More fundamentally, the fact that CEO Ernst had executed an employment agreement with the acquirer cannot, in and of itself, establish a strong inference of motive. As the Fourth Circuit explained in *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 622-23 (4th Cir. 1999):

> [A]ssertions that a corporate officer or director committed fraud in order to retain an executive position, or retain such a position with the merged company, simply do not, in themselves, adequately plead motive. . . .

The rationale underlying these holdings is straightforward. Similar situations arise in every merger; thus, allowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary . . . would force the directors of virtually every company to defend securities fraud actions, every time that company effected a merger or acquisition.

*Accord Kalnit*, 264 F.3d at 139-40 ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers."). Because Plaintiffs' allegations regarding the Ernst employment agreement do nothing to distinguish her motivations from those surrounding countless other mergers and acquisitions, the proposed amended Complaint fails to create a strong inference of scienter as required by the PSLRA.

B.

A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535. Allowing Plaintiffs to plead recklessness is intended to "discourage[] deliberate ignorance and

prevent[] defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud." *Id.* Scienter therefore requires "a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.'" *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979) (quoting *Coleco Indus., Inc. v. Berman*, 567 F.2d 569, 574 (3d Cir. 1977) (per curiam)). Recklessness is not intended to encompass "claims essentially grounded on corporate mismanagement." *Advanta*, 180 F.3d at 540.

We agree with the District Court that Plaintiffs' allegations fail to create a strong inference of recklessness. Because Plaintiffs' allegations show that Defendants' interests were at all times tied to the value of their shares, we have no basis to infer the sort of conscious disregard and deliberate ignorance required to plead scienter. At most, Plaintiffs' allegations show that the Directors failed to exploit the potential that the Bloomberg and MLB deals had to increase the value of Digital Island shares, whether through the tender offer price paid by C&W or on the open market. Such alleged mismanagement does not fall within the anti-fraud prohibitions of Section 14(e).

IV.

Section 14(d)(7) of the '34 Act provides, in pertinent part:

Where any person varies the terms of a tender offer . . . before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer . . . .

15 U.S.C. § 78n(d)(7).[14] SEC Rule 14d-10(a)(2), the "Best Price Rule," implements Section 14(d)(7) and provides: "No bidder shall make a tender offer unless . . . [t]he consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer." 17 C.F.R. § 240.14d-10(a). Plaintiffs allege that the Directors received "extra consideration" for their shares when their options and restricted stock were cashed out in the merger pursuant to the

---

[14] Plaintiffs do not appeal dismissal of this claim as to Digital Island or any of the individual defendants other than Wallace. As the District Court recognized, the Best Price Rule, by its terms, only applies to bidders. *Digital Island*, 223 F. Supp. 2d at 556. On appeal, Plaintiffs offer no explanation why Defendant Wallace should be considered a bidder. We therefore will affirm the District Court's dismissal of the Best Price Rule claim with respect to Defendant Wallace on the ground that Defendant Wallace is not a bidder within the meaning of the rule.

Merger Agreement.[15]  In addition, Plaintiffs allege that the employment agreement between C&W and CEO Ernst further constituted a premium for her shares.  There is no dispute that both the Merger Agreement and the Ernst Employment agreement were executed prior to the tender offer.

The District Court adopted, and Defendants urge this Court to adopt, a "bright-line rule" that payments arising out of an agreement executed prior to a tender offer do not state a claim under the Best Price Rule, which expressly applies only to payments made "during a tender offer." 17

---

[15]  The proposed amended Complaint alleges that this consideration exceeds that received by other Digital Island shareholders, although Plaintiffs make no allegation that Digital Island's outstanding options and restricted stock were held exclusively by the Directors.

Curiously, Plaintiffs argue in their brief that we should read the proposed amended Complaint to allege that the extra payment was made when the Directors tendered their shares.  If that is the case, we do not understand how the Directors could have received the extra consideration alleged by Plaintiffs, which is premised on the allegation that those options were partially unvested at the time of the merger.  If the Directors did indeed exercise their options, to the extent vested, they were simply paid the tender price for each share tendered like every other shareholder.

C.F.R. § 240.14d-10(a).  The District Court and Defendants rely heavily on *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 245 (7th Cir. 1996), in which the Seventh Circuit held that "transactions before or after a tender offer are outside the scope of Rule 14d-10."  The plaintiff in *Lerro* alleged that a controlling shareholder had received extra compensation for his shares in the form of an exclusive distribution agreement executed by the tender offeror and the controlling shareholder prior to the tender offer.  *Id.* at 240.  The agreement was to commence upon consummation of the offer.  *Id.*  The court held that the value of the distribution agreement did not constitute extra compensation in violation of the Best Price Rule because the agreement was signed before the offer began.  *Id*. at 244.  The court reasoned:

> Before the offer is not "during" the offer. . . . The difference between "during" and "before" (or "after") is not just linguistic.  It is essential to permit everyone to participate in the markets near the time of a tender offer.  Bidders are forbidden to buy or sell on the open market or via negotiated transactions during an offer, but they are free to transact until an offer begins, or immediately after it ends.

*Id*. at 243; *see also Katt v. Titan Acquisitions, Inc.*, 244 F. Supp. 2d 841, 850 (M.D. Tenn. 2003) (stating that Rule 14d-10 "is, on its face, 'aimed at conduct during the pendency of the tender offer'" (quoting *Walker v. Shield Acquisition*

*Corp.*, 145 F. Supp. 2d 1360, 1375 (N.D. Ga. 2001))).

Plaintiffs urge this Court to adopt a more flexible rule that focuses on whether the allegedly improper payment is an integral part of the tender offer. For their part, Plaintiffs rely on *Epstein v. MCA, Inc.*, 50 F.3d 644 (9th Cir. 1995), in which the Ninth Circuit rejected the argument that Rule 14d-10 turns on the timing of the payment. *Epstein* did not involve an agreement executed *prior* to the tender offer period.[16] Instead, the issue in *Epstein* was whether a payment made *after* the tender offer expired could violate the Best Price Rule. The Ninth Circuit held that such a payment could establish a violation, reasoning that to hold otherwise

> would drain Rule 14d-10 of all its force [since] even the most blatantly discriminatory tender offer—in which large shareholders were paid twice as much as small shareholders—would fall outside Rule 14d-10's prohibition, so long as the bidder waited a few seconds

after it accepted all of the tendered shares before paying the favored shareholders.

*Id*. at 655. *Epstein* held that the proper focus should be "whether the . . . transaction was an integral part of [the] tender offer." *Id*.[17]

We agree with the Seventh Circuit and the District Court that the market requires a bright-line rule "to demark

---

[16] The agreements in *Epstein* were executed the same day on which the tender offer was announced, thus occurring during the tender offer under Rule 14d-2(a), which provides that, for purposes of Section 14(d), a tender offer commences "at 12:01 a.m. on the date when the bidder has first published, sent, or given the means to tender to security holders." 17 C.F.R. § 240.14d-2(a); *see Epstein*, 50 F.3d at 653, 655 & n.18, 657.

[17] We regard *Epstein* as persuasive, despite the fact that it was reversed on other grounds by the Supreme Court. *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996). *Epstein* is apparently regarded as precedential within the Ninth Circuit, *e.g.*, *Harris v. Intel Corp.*, No. 00-CV-1528, 2002 WL 1759817, at *5 (N.D. Cal. July 8, 2002), and has been adopted by district courts in other circuits, *e.g.*, *Katt v. Titan Acquisitions, Inc.*, 133 F. Supp. 2d 632, 644 (M.D. Tenn. 2000). *Epstein* was also cited with approval by the Second Circuit in *Gerber v. Computer Assocs. Int'l, Inc.*, 303 F.3d 126 (2d Cir. 2002). *Gerber* involved a non-compete agreement between a bidder and a shareholder executed during a tender offer. *Gerber* held that it was immaterial that payment was not made under the non-compete agreement until after the expiration of the tender offer. Quoting *Epstein*, the court held that the Best Price Rule "cannot be so easily circumvented" by simply delaying payment until after the expiration date. *Id*. at 135 (quoting *Epstein*, 50 F.3d at 655).

clearly the periods during which the special Williams Act rules apply." *Lerro*, 84 F.3d at 243. We also agree with *Epstein* that tender offerors cannot be permitted to evade the requirements of the Williams Act simply by delaying the actual payment, or by agreeing on the extra payment beforehand. Indeed, *Lerro* itself acknowledges that some payments made outside of the tender offer period may be so transparently fraudulent as to require them to be treated as made "during the tender offer":

> Doubtless there are limits to the use of a follow-up merger as a means to deliver extra compensation. Suppose [the acquirer] had promised [a shareholder] $14 for each share he tendered during the offer, plus another $6 for each of these shares one month later. Just as tax law requires "boot" to be treated as a gain received from the sale of stock, securities law treats "boot" as a payment during the tender offer.

*Lerro*, 84 F.3d at 245. Nevertheless, the exception to the general rule is a narrow one, and Plaintiffs' allegations do not fall within it.

Where, as here, a plaintiff argues that the Best Price Rule has been violated by a transaction executed prior to the tender offer, the plaintiff necessarily alleges that the tender offeror has *fraudulently* devised a scheme to circumvent the Rule. An offeror can and will enter into a wide variety of agreements, including agreements with shareholders, that are conditioned on the success of the tender offer. The Ernst employment agreement is a perfect example: An offeror who intends to operate a company as a going concern after the acquisition may reasonably attempt to secure the services of incumbent management. Only where the tender offeror deliberately inflates that compensation to provide a premium for the officer's shares is there a violation of the Best Price Rule. In such instances, the tender offeror has attempted to defraud the shareholders of the target company of the equal consideration to which they are entitled under the Williams Act and the Best Price Rule.

Accordingly, in order to base recovery under the Best Price Rule on a transaction executed prior to the commencement of a tender offer, Plaintiffs must comply with Fed. R. Civ. P. 9(b), which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 287-89 (3d Cir. 1992) (holding that Rule 9(b) applies to claims under Sections 11 and 12(2) of the Securities and Exchange Act of 1933, 15 U.S.C. §§ 77k, 77l, when those claims are grounded in fraud). Rule 9(b)'s particularity requirement, which "has been rigorously applied in securities fraud cases," *Burlington*, 114 F.3d at 1417, requires plaintiffs to "accompany their legal theory with factual allegations that

make their theoretically viable claim plausible," *id.* at 1418. Furthermore, under the PSLRA, Plaintiffs must allege facts giving rise to a strong inference that C&W acted with fraudulent intent; that is, that C&W intended to provide a premium to the Directors for their shares through the Merger Agreement and the Ernst employment agreement. 15 U.S.C. § 78u-4(b)(2); *see also Burlington*, 114 F.3d at 1418 (requiring, prior to passage of the PSLRA, allegations supporting a "'strong inference' that the defendant possessed the requisite intent" to satisfy Rule 9(b)).

With respect to the Merger Agreement, Plaintiffs allege that the Directors received "extra compensation" to the extent that they were able to cash out all of their options and restricted stock at once. As a threshold matter, we question whether the Best Price Rule should ever apply to payments made pursuant to a second-step merger. We find persuasive the Second Circuit's reasoning in *Kramer v. Time Warner Inc.*, 937 F.2d 767, 779 (2d Cir. 1991):

> [W]e perceive no basis in the language, structure or legislative history of the Act for viewing a second-step statutory merger following a successful tender offer for 51 percent of a target's shares as a continuation of the tender offer. Such a merger lacks the most salient characteristics of a tender offer—an offer to purchase, tender and acceptance. Moreover, state and federal law clearly treat mergers as distinct from tender offers. Statutory mergers are authorized and regulated by state corporation codes, and federal regulation of such mergers is found in federal regulations concerning the solicitation of proxies. Finally, the Williams Act contains, in addition to the "best price" provision, time limits, disclosure requirements, pro rata acceptance rules, and provisions for withdrawal of tendered shares that make no sense whatsoever in the merger context.[18]

*Accord Lerro*, 84 F.3d at 244 ("*Kramer* rejects, rightly we think, any argument that a follow-up merger should be integrated with a tender offer. They are different transactions, under different bodies of law . . . ."); *Epstein*, 50 F.3d at 659 n.21 (distinguishing *Kramer* on the grounds that *Kramer*, unlike *Epstein*, involved a second-step statutory merger).[19]

---

[18] In *Kramer*, the plaintiff claimed that certain officers received payments for their stock options in connection with a merger that exceeded the price paid to other shareholders pursuant to the merger. *Id.* at 778-79 & n.5.

[19] Plaintiffs allege that the payments received by the Directors were consideration for options and restricted stock that were held prior to the Merger Agreement. This ground further distinguishes *Epstein*, where the options themselves were alleged to be conditioned

As discussed above, Plaintiffs fail to cobble together a coherent theory as to how these payments could have induced the Directors to suppress the Bloomberg and MLB deals and support the tender offer. Conversely, we have difficulty understanding how these payments could give rise to an inference that they were intended by C&W as such an inducement. More fundamentally, the fact that the merger cashed out certain unvested holdings of the Directors, without more, cannot establish a strong inference of fraudulent intent. Plaintiffs do not allege that these holdings were anything but pre-existing, legitimate obligations of Digital Island. The only inference we can take from these allegations, then, is that C&W chose to honor Digital Island's existing obligations. Plaintiffs provide no explanation for why this behavior should raise suspicion, particularly where C&W intended to operate Digital Island as a going concern.

Nor have Plaintiffs alleged any facts that would render the Ernst employment agreement suspect. Plaintiffs do not allege that Ernst's employment agreement is a sham transaction designed to insulate an improper tender offer premium. They do not contend that the compensation package was excessive, or that it was out of line with amounts that similarly situated executives were paid. Instead, Plaintiffs simply characterize the agreement as "lucrative." This conclusory

___

on the success of the tender offer. 50 F.3d at 658.

allegation provides no basis on which to infer the payment of a share premium in violation of the Best Price Rule.

The facts alleged by Plaintiffs are therefore a far cry from *Epstein*. In that case, the tender offeror executed an agreement with one of the shareholders, Sheinberg, under which Sheinberg would receive a lump sum payment if the tender offer succeeded. *Epstein*, 50 F.3d at 657. Immediately after the execution of the agreement—*i.e.*, that same day—the tender offer was announced. *Id*. at 653, 657. The defendant in *Epstein* claimed that the payment was to induce Sheinberg to stay on as an officer and to cash out his stock options under the merger. *Id*. at 657. Plaintiffs argued, however, that the options themselves were conditioned on the success of the tender offer. *Id*. at 658. With respect to Sheinberg's "amended employment agreement," Plaintiffs pointed out that the payment appeared to correspond precisely to the value of his options, *i.e.*, there was no compensation for services. *Id*. at 658-59. *Epstein* thus involved precisely the kind of allegations of fraud that a bright line rule would exclude from Best Price Rule protection. Further proceedings were therefore necessary to determine the purpose of the Sheinberg agreement, *i.e.*, whether the lump sum payment "constitutes incentive compensation that [the offeror] wanted to give Sheinberg independently of the . . . deal, or a premium that [the offeror] wanted to give Sheinberg as an inducement to support the tender offer and tender his own shares." *Id*. at 659.

To the extent that *Epstein* holds that the proper inquiry in such cases is whether the transaction "unconditionally obligated" the offeror, we respectfully reject that holding. *Id.* at 656-57; *see also id.* at 656 (concluding that an agreement was "an integral part of the offer and subject to Rule 14d-10's requirements" because the agreement was "conditioned on the tender offer's success"). Whether the offeror was unconditionally obligated would be important if we were dealing with an outright purchase of securities. *See* 17 C.F.R. § 240.14e-5(b)(7) (allowing purchases of securities during—but "outside"—of a tender offer where purchase is pursuant to an unconditional and binding contract entered into before public announcement of the tender offer); *Epstein*, 50 F.3d at 656 ("Thus a bidder who purchases shares from a particular shareholder before a tender offer begins does not violate Rule 14d-10."). But tender offerors routinely engage in transactions not involving the purchase of securities that are conditioned on the success of the tender offer (*e.g.*, if the offer fails, the prospective "employer" never comes into existence). *Epstein's* "unconditionally obligated" test should not subject all of these transactions to challenge under the Best Price Rule. *See also Lerro*, 84 F.3d at 244-45 (warning against a construction of the Best Price Rule that "would imperil countless ordinary transactions [including] simple employment agreements under which the surviving entity promises to employ managers for stated terms or give severance pay").

Instead, when applying the Best Price Rule to a transaction that is executed outside of the tender offer period and that nominally does not involve the purchase of securities, the "central issue" is whether a given payment constitutes "a premium that [the offeror] wanted to give [the shareholder] as an inducement to support the tender offer and tender his own shares." *Epstein*, 50 F.3d at 659; *see, e.g.*, *Katt*, 244 F. Supp. 2d at 857-58. This, of course, requires an intent to defraud the remaining shareholders of their entitlement to equal consideration under the tender offer. Accordingly, when reviewing a complaint alleging a violation of Rule 14d-10 based on a transaction executed prior to the commencement of a tender offer, the trial court should determine whether the plaintiff has met the heightened pleading requirements of Rule 9(b) and the PSLRA.

We conclude that Plaintiffs' allegations do not meet these heightened pleading standards. The proposed amended Complaint allows no reasonable—let alone strong—inference that the Merger Agreement or the Ernst employment agreement conceal a fraudulent share premium in violation of the Best Price Rule. We acknowledge that we are applying for the first time the pleading requirements of Rule 9(b) and the PSLRA to a Best Price Rule claim. Nevertheless, we believe that allowing Plaintiffs an opportunity to amend this claim would be futile. Plaintiffs' theory of fraud with respect to their Best Price Rule claim mirrors the theory underpinning their Section 14(e) claim and we have rejected

as implausible Plaintiffs' most recent iteration of this theory. We see no reason to allow them a third opportunity under the Best Price Rule.

V.

Section 20(a) provides, in pertinent part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. § 78t(a). Liability under Section 20(a) is derivative and must be predicated upon an independent violation of the '34 Act. *Advanta*, 180 F.3d at 541. Accordingly, because we will affirm the District Court's dismissal of Plaintiffs' fraud and Best Price Rule claims for failure to state a claim, the proposed amended Complaint necessarily fails to state a claim under Section 20(a).

VI.

Finally, we address the District Court's denial of Plaintiffs' motion under Rules 59(e) and 15(a) to alter the judgment and to obtain leave to file an amended complaint. We have determined that Plaintiffs' proposed amended Complaint fails to state a claim under Rule 12(b)(6) and the PSLRA and that leave to amend would therefore be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002). Accordingly, we will affirm the District Court's order denying Plaintiffs leave to amend.

VII.

Because Plaintiffs failed to allege facts giving rise to a strong inference that Defendants acted with scienter in regard to their statements and/or silence concerning the Bloomberg and MLB deals, we will affirm the District Court's dismissal of their Section 14(e) claim. Likewise, we will affirm dismissal of Plaintiffs' Best Price Rule claim because it depends on the same implausible theory of fraud as their Section 14(e) claim. Moreover, dismissal of these claims compels dismissal of Plaintiffs' Section 20(a) claims, which are derivative of the Section 14(e) and Best Price Rule claims. Finally, our analysis has taken into consideration the additional allegations in Plaintiffs' proposed amended Complaint. We therefore will affirm the District Court's denial of leave to amend on the basis of futility.